## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 1:08-cv-00069 (CKK) |
| ELAINE L. CHAO, Secretary, United States Department of Labor, | ) ) ) ) |
| Defendant. | ) ) ) |

### DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

Defendant Secretary of Labor ("Secretary" or "Department") hereby cross-moves for summary judgment under Federal Rule of Civil Procedure 56 and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, on the AFL-CIO's Complaint. The Department requests that the Court enter a judgment denying the AFL-CIO's Motion for Summary Judgment and a judgment finding lawful the final rule entitled "Labor Organization Officer and Employee Report, Form LM-30," 72 Fed. Reg. 36106 (July 2, 2007) (amending 29 C.F.R. Part 404).

This cross-motion is supported by a Memorandum Of Points And Authorities In Support Of Defendant's Cross-Motion For Summary Judgment And In Opposition To Plaintiff's Motion For Summary Judgment, and by a Response To Plaintiff's Statement of Material Facts As To Which There Is No Dispute and Defendant's Statement Of Material Facts As To Which There Is No Genuine Issue.

As explained in the memorandum of points and authorities, summary judgment is appropriate here because the Final Rule is a permissible exercise of the Secretary's authority

under § 202 of the Labor Management Reporting And Disclosure Act, 29 U.S.C. § 401 *et seq.*  In

addition, the Secretary issued the Final Rule in accordance with the procedural requirements of

the APA, and provided a reasoned explanation for a particular aspect of the Rule contested by

Plaintiff.  Finally, there are no material facts in dispute.  Accordingly, the Department's cross

motion for summary judgment should be granted.


DATED: April 21, 2008                    Respectfully submitted,

                                         JEFFREY BUCHOLTZ
                                         Acting Assistant Attorney General

                                         JEFFREY A. TAYLOR
                                         United States Attorney

                                         RICHARD G. LEPLEY
                                         Assistant Branch Director, Civil Division, Federal
                                         Programs Branch

                                         */s/ Tara M. La Morte*
                                         TARA M. La MORTE
                                         Trial Attorney
                                         Civil Division, Federal Programs Branch
                                         United States Department of Justice
                                         20 Massachusetts Ave., N.W., Room 7326
                                         Washington, D.C.  20530
                                         Telephone:  (202) 514-1275
                                         Facsimile:   (202) 616-8202
                                         Email: tara.lamorte@usdoj.gov

                                         *Attorneys for Defendant*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:08-cv-00069 (CKK) |
| ELAINE L. CHAO, Secretary, United States Department of Labor, | ) ) ) ) | |
| Defendant. | ) ) | |

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT, AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION.................................................................................................... 1

BACKGROUND. .................................................................................................... 3

1.      Statutory and Regulatory Background. ........................................................... 3

      A.    The Labor-Management Reporting and Disclosure Act. ......................... 3

      B.    Labor Organization and Employee Report, Form LM-30....................... 5

II.     The Revised Form LM-30................................................................................. 7

      A.    Basis and Purpose of the Final Rule. ...................................................... 7

      B.    Requirements of the Final Rule. ............................................................ 10

ARGUMENT. ....................................................................................................... 13

I.      Standard of Review......................................................................................... 13

II.     The Reforms Adopted In the LM-30 Final Rule Are A Reasonable Exercise Of The Secretary's Authority Under the LMRDA. ........................................................ 14

      A.    The Secretary's Conclusions That Union Stewards Are Union Employees Subject To Reporting Requirements, and Are Required To Disclose Employer-funded " Union-Leave" And "No Docking" Payments, Represent Reasonable Interpretations Of Ambiguous Statutory Language And Are Critical To Achieving Congress' Objectives.......................................................... 14

            1.    The Secretary's Decision That "Employees" Of A Labor Organization Include Individuals Performing Work On Behalf Of, And Under The Control Of, The Labor Organization Notwithstanding That Payment For Such Work Is Made By The Employer Is A Permissible Interpretation Of The LMRDA § 202 And Entitled To Deference..................................... 15

            2.    The Secretary Reasonably Determined That A Union Steward Must Disclose "Union Leave" And "No-Docking" Payments Made By An

Employer Because Such Payments Do Not Fall Within The Act's Reporting Exception For Payments Received As A "Bona Fide Employee" Of The Employer............................................................................................................. 20

B.   Section 202(a)(6) of the LMRDA Authorized The Secretary To Establish A Rule Requiring Reporting Of Payments From "Any" Employer, Including Charities, Other Labor Organizations, And Union-Trusts In Situations Giving Rise To Potential Conflicts Of Interest.............................................................................. 26

C.   The Secretary Provided A Rational Explanation For Limiting § 202(a)(6)'s Administrative Exception So As To Require Reporting Of Loans From Trusts In Which Labor Organizations Hold An Interest. ..................................................... 30

D.   The Secretary Has Authority to Mandate Loan Reporting Under §202(a)(3) And (a)(4) of the LMRDA, And The Requirement That Union Officers And Employees Do So On The LM-30 Does Not Violate The APA's Notice-And-Comment Requirement. ...................................................................................... 36

   1.   LMDRA Sections 202(a)(3) and (a)(4) Are Easily Read To Mandate Reporting Of  Loans................................................................................ 36

   2.   The Secretary's Interpretation of "Benefit with Monetary Value" As Encompassing Loans Is An Interpretive Rule Exempt From Notice And Comment Requirements............................................................................ 40

   3.   Alternatively, The Secretary's Requirement That Labor Officials/ Employees Report Loans Obtained From Businesses Under Sections 202(a)(3) And (a)(4) Is A Logical Outgrowth Of the Proposed Rule. ...... 43

E.   If Any Of Plaintiff's Challenges Are Sustained, The Appropriate Remedy Is To Remand The Unlawful Portion Of The Rule. ...................................................... 45

CONCLUSION. ................................................................................................................. 45

# TABLE OF AUTHORITIES

**CASES**          **PAGE (S)**

AFL-CIO v. Chao,
    298 F. Supp. 2d 104 (D.D.C. 2004). ............................................................. 38

*AFL-CIO v. Chao,
    409 F.3d 377 (D.D.C. 2005). .................................................... 13, 33

Ala. Educ. Ass'n v. Chao,
    455 F.3d 386 (D.C. Cir. 2006). ...................................................... 29

*Ala. Educ. Ass'n v. Chao,
    No. 03-253 (D.D.C. Mar. 27, 2008).................................................. 35

*Ali v. Fed. Bureau of Prisons,
    128 S. Ct. 831 (2008). ......................................................... 27, 30

Allied Local & Reg'l Mfrs. Caucus v. EPA,
    215 F.3d 61 (D.C. Cir. 2003). ...................................................... 31

Allied-Signal, Inc. v. Nuclear Regulatory Comm'n,
    988 F.2d 146 (D.C. Cir. 1993). ..................................................... 45

Barnhart v. Walton,
    535 U.S. 212 (2002)............................................................. 13, 38

Brock v. Local 538, Int'l Bhd. of Teamsters,
    645 F. Supp. 156 (W.D. Pa. 1986)................................................ 27

Camp v. Pitts,
    411 U.S. 138 (1973)............................................................. 19

*Caterpillar, Inc. v. United Auto Workers,
    107 F.3d 1052 (3d Cir. 1997)......................................... 18, 22, 25

Cent. Tex. Tel. Coop., Inc. v. FCC,
    402 F.3d 205 (D.C. Cir. 2005). ................................................. 42, 43

*Chevron U.S.A., Inc. v. NRDC,
467 U.S. 837 (1984)............................................................... passim

Dagitt v. United Food and Commercial Workers Int'l Union, Local 304A,
    345 F.3d 981 (8th Cir. 2001). ........................................................................ 18

Dean v. American Federation of Government Employees, Local 476,
    509 F. Supp. 2d 39 (D.D.C. 2007). ........................................................... 17, 18

Donovan v. Blasters, Drillrunners & Miners Union, Local 29,
    521 F. Supp. 595 (S.D.N.Y. 1981).................................................................. 27

ExxonMobil Gas Mktg. Co. v. FERC,
    297 F.3d 1071 (D.C. Cir. 2002). .................................................................... 31

Fertilizer Inst. v. EPA,
    935 F.2d 1303 (D.C. Cir. 1991). .................................................................... 45

First Am. Discount Corp. v. Commodity Futures Trading Comm'n,
    222 F.3d 1008 (D.C. Cir. 2000). .................................................................... 43

Fla. Power & Light Co v. Lorion,
    470 U.S. 729 (1985)................................................................................... 16, 19

Formula v. Heckler,
    779 F.2d 743 (D.C. Cir. 1985). .................................................................. 31, 36

General Motors Corp. v. Ruckelshaus,
    742 F.2d 1561. ............................................................................................... 42

Graves v. Women's Professional Rodeo Ass'n,
    907 F.2d 71 (8th Cir. 1990). ...................................................................... 17, 18

Huls Am. Inc. v. Browner,
    83 F.3d 445 (D.C. Cir. 1996). ....................................................................... 31

Mallick v. Int'l Bhd. of Elec. Workers,
    749 F.2d 771 (D.C. Cir. 1984). ....................................................................... 3

Marshall v. Local Union 20, Int'l Bhd. of Teamsters,
    611 F.2d 645 (6th Cir. 1979). ........................................................................ 27

Mourning v. Family Publ'ns Serv.,
    411 U.S. 356 (1973).......................................................................................15

NLRB v. Town & Country Elec., Inc.,
    516 U.S. 85 (1995).........................................................................................17

-iv-

Nat'l Home Equity Mortgage Ass'n v. Office of Thrift Supervision,
    271 F. Supp. 2d 264 (D.D.C. 2003). ............................................................. 31

Nat'l Home Equity Mortgage Ass'n v. Office of Thrift Supervision,
    373 F.3d 1355 (D.C. Cir. 2004). ................................................... 14, 30, 31

*Nationwide Mutual Insurance Co. v. Darden,
    503 U.S. 318 (1992). .................................................... 16, 17, 18, 19

Pauley v. BethEnergy Mines, Inc.,
    501 U.S. 680 (1991). ................................................................... 23

*Reinforcing Iron Workers Local Union 426 v. Bechtel Power Corp.,
    634 F.2d 258 (6th Cir. 1981). ................................................ 18, 24-25

Smith v. United Mine Workers,
    493 F.2d 1241 (10th Cir. 1974). ............................................... 21

Spirides v. Reinhardt,
    613 F.2d 826 (D.C. Cir. 1979). .................................................. 17

Syncor Int'l Corp. v. Shalala,
    127 F.3d 90 (D.C. Cir. 1997). .............................................. 41, 42

Thomas Jefferson Univ. v. Shalala,
    512 U.S. 504 (1994). ................................................................ 38

Trailways Lines, Inc. v. Trailways, Inc. Joint Council, Amalgamated Transit Union,
    785 F.2d 101 (3d Cir. 1986). ..................................................... 18

United States Air Tour Ass'n v. FAA,
    298 F.3d 997 (D.C. Cir. 2002). ................................................. 31

United States Postal Serv. v. Gregory,
    534 U.S. 1 (2001). ................................................................... 31

United States v. Ron Pair Enter., Inc.,
    489 U.S. 235 (1989). ................................................................ 13

United Steelworkers v. Sadlowski,
    457 U.S. 102 (1982). .......................................................... 21, 38

United Tech. Corp. v. EPA,
    821 F.2d 714 (D.C. Cir. 1987). .......................................... 40, 41, 42

Warshauer v. Chao,
    No. 06-0103 (N.D. Ga. Aug. 25, 2006). ........................................................ 43

*Wirtz v. Local 153, Glass Bottle Blowers Ass'n,
    389 U.S. 463 (1968). ........................................................................... 3, 21

## STATUTES, REGULATIONS, AND SELECT LEGISLATIVE HISTORY

5 U.S.C. § 553(b). .......................................................................................... 40

5 U.S.C. § 706 .............................................................................................. 19

29 U.S.C. § 401(a)-(c). ............................................................................. passim

9 U.S.C. §§ 401-531 ("LMRDA"or "Act"). ................................................. passim

29 U.S.C. § 402(l). .................................................................................... 2, 26

29 U.S.C. § 402(e). .................................................................................. 16, 28

29 U.S.C. § 431(b)(4), (b)(5). ....................................................................... 35

29 U.S.C. §§ 431-41. .................................................................................... 3

29 U.S.C. § 432. ...................................................................................... passim

29 U.S.C. § 433. ..........................................................................................35

29 U.S.C. § 440. ........................................................................................... 1

29 U.S.C. § 501. ................................................................................. 14, 19, 23

29 U.S.C. § 503. .......................................................................................... 35

LMRA § 302(c). ......................................................................................passim

28 Fed. Reg. 14384 (Dec. 27, 1963). ............................................................ 5

70 Fed. Reg. 51166 (Aug. 29, 2005). ...................................................... passim

70 Fed. Reg. 61400 (Oct. 24, 2005). ............................................................ 10

72 Fed. Reg. 36106 (July 2, 2007). .......................................................... 10, 11

93 Cong. Rec. 4805 (1987). ...................................................................................... 24

H.R. Rep. No. 741 (1959)...................................................................................passim

*Interim Report of the Select Committee on Improper Activities in the Labor or Management Field*, S. Rep. No. 85-1417 (1957)................................................................. passim

S. Rep. No. 187 (1959)..................................................................................... passim

S. 3974, 85th Cong. (1958), § 102(a) ...............................................................38

## MISCELLANEOUS

Terry Leap, *Collective Bargaining and Labor Relations* 203, 216, 300 (1995)...........................14

Herman Erickson, *The Steward's Role in the Union* 20-30 (1971)................................................14

Benjamin Aaron, *The Labor-Management Reporting and Disclosure Act of 1959*, 73 Harv. L. Rev. 851, 877 (1960)...........................................................................................5

Christopher J. Garofalo, *Section 302 of the LMRA: Make Way For the Employer Paid Union Representative*, 75 N.Y.U. L. Rev. 775 (2000)...........................................................................................22

## INTRODUCTION

Acting in the wake of investigations that revealed "a number of instances of breach of trust, corruption, disregard of the rights of individual employees, and other failures to observe high standards of responsibility and ethical conduct," 29 U.S.C. § 401(b), Congress enacted the Labor-Management Reporting and Disclosure Act, 29 U.S.C. §§ 401-531 ("LMRDA" or "Act"), in 1959. Title II of the Act, entitled "Reporting by Labor Organizations, Officers and Employees of Labor Organizations, and Employers," requires these individuals and entities to disclose details regarding their financial arrangements through annual reports filed with the Secretary, U.S. Department of Labor ("Secretary" or "Department").  Declaring that the Act, including its reporting requirement, was "necessary to eliminate or prevent improper practices" that harmed union members and employees, § 401(c), Congress vested the Secretary with authority to "issue, amend, and rescind rules and regulations prescribing the form and publication of reports required to be filed under Title II of the Act," as well as other reasonable rules and regulations she finds necessary "to prevent the circumvention or evasion of such reporting requirements," § 438.[1]

In the ensuing decades, dramatic changes in the nature and complexity of financial transactions have increased the likelihood that labor union officers and employees are engaging in reportable activities, yet the basic reporting requirements for these individuals – embodied in the Form LM-30, Labor Organization Officer and Employee Reports – have remained largely unchanged since 1963.  Considered in this context, it is not surprising that the Secretary's audits and investigations have revealed many instances where a union officer or employee failed to file a Form LM-30 notwithstanding receipt of a payment required to be disclosed by the Act.  The Department's review of the reporting regime also revealed that the Form LM-30 excepted from reporting several types of payments that fall within the scope of § 202 of the Act, 29 U.S.C. § 432.  For today's complicated financial transactions, such disclosure is necessary to inform union members of actual

---

[1]Congress also vested the Secretary with the power to "bring a civil action for such relief (including injunctions)," "whenever it shall appear that any person has violated or is about to violate any of the provisions of [Title II]."  29 U.S.C. § 440.

or potential conflicts of interests that might require greater scrutiny or action. For this reason, the Secretary redesigned the Form LM-30 through notice-and-comment rulemaking. The Secretary's revisions were intended to facilitate full and accurate completion of the Form LM-30 by the filer and review by union members and the public, and to clarify the Act's disclosure obligations relating to actual or potential conflicts of interest.

Plaintiff, the AFL-CIO, seeks to vacate the Rule by challenging selective aspects of it. First, by adopting a cramped reading of the statutory text against contrary Supreme Court and Congressional guidance, Plaintiff argues that each of the challenged revisions compels disclosure in excess of what the Act requires. Plaintiff also asserts that the Secretary violated the Administrative Procedure Act's ("APA") notice-and-comment requirement by reminding filers of their obligation to report loans obtained from financial institutions that meet statutory threshold conditions. Finally, Plaintiff accuses the Secretary of failing to provide a reasoned explanation for requiring the reporting of loans received from a credit institution in which the labor organization officer/employee's labor union has an interest[2], notwithstanding the evident potential conflicts of interest posed by that scenario. Through this action, Plaintiff seeks to block access to critical financial information of labor organization officers and employees by union members, the Secretary, and the public.

Plaintiff's assertions that the Secretary exceeded her statutory authority represent nothing more than policy disagreements with the Secretary's choices. As demonstrated below, the reporting obligations imposed by the new rule fall squarely within the boundaries of § 432, and directly advance the purposes underlying passage of the LMRDA. As a permissible interpretation of the Act, these aspects of the Secretary's rule are entitled to substantial deference under *Chevron* – a standard

---

[2]The LMRDA defines this entity as "created or established" by a union or whose governing board has one or more members selected or appointed by the union and which has as a primary purpose the provision of benefits to union members or their beneficiaries. *See* 29 U.S.C. § 402(l) (defining "trust in which a labor organization is interested").

of review wholly ignored by Plaintiff.  Next, Plaintiff's notice-and-comment allegation is likewise without merit, as the reporting of loans obtained from certain businesses is not a new requirement and, in any event, constitutes an interpretive rule not subject to notice-and-comment analysis.  Even if this were not the case, the Final Rule's reference to this obligation is a logical outgrowth of the proposed rule.  Finally, far from lacking a reasoned explanation, the Secretary has propounded a sound rationale for demanding the reporting of loans obtained from credit institutions in which the labor official/employee's labor organization has an interest.  While the revised Form LM-30 undeniably demands increased reporting, it does so lawfully and in furtherance of the Act's declared purpose "that labor organizations, employers, and their officials adhere to the highest standards of responsibility and ethical conduct in administering the affairs of their organizations."  § 401(a).

## BACKGROUND

### I.     Statutory And Regulatory Background.

#### A.     *The Labor-Management Reporting and Disclosure Act.*

The LMRDA is primarily intended to ensure that unions will be democratically governed and responsive to the will of their memberships.  After extensive Congressional investigation conducted by the Select Committee on Improper Activities in the Labor or Management Field, Congress concluded, in a statutory declaration of findings, purpose, and policy, that "there have been a number of . . . failures to observe high standards of responsibility and ethical conduct," and that these circumstances required "supplementary legislation that will afford necessary protection of the rights and interests of employees and the public generally as they relate to the activities of labor organizations, employers, labor relations consultants, and their officers and representatives."  29 U.S.C. § 401(b); *see generally Wirtz v. Local 153, Glass Bottle Blowers Ass'n*, 389 U.S. 463, 468-71 (1968); *Mallick v. Int'l Bhd. of Elec. Workers*, 749 F.2d 771, 776-77 (D.C. Cir. 1984).

This action concerns the reporting provisions of Title II of the LMRDA, 29 U.S.C. §§ 431-41.  In particular, LMRDA § 202, 29 U.S.C. § 432, requires labor organization officers and employees to file with the Secretary a financial report if they, or their spouse or minor child engaged

in certain financial transactions or held certain interests in the preceding reporting year.  Congress enacted these statutory reporting requirements after uncovering a host of improper financial arrangements between officials and employees of several international and local labor organizations and employers whose employees their labor organizations represented or might seek to represent. Similar dubious arrangements were also found to exist between labor union officials and employees and companies doing business with their labor organizations, companies doing business with employers whose employees their labor union represented or could represent, and other companies that handled matters relating to the administration of labor organization benefit funds.  *See generally Interim Report of the Select Committee on Improper Activities in the Labor or Management Field*, S. Rep. No. 85-1417 (1957) ("Interim Report").

Financial reporting and disclosure were conceived as partial remedies to curb self-dealing, fraud, and other improper practices.  The Senate Committee Report presented three reasons for relying upon reporting and disclosure, as opposed to criminal penalties, to deter and eliminate improper conflicts of interest.  First, the Senate observed that compelled disclosure discourages questionable practices:  "The searchlight of publicity is a strong deterrent."  *See* S. Rep. No. 187, at 16 (1959), *reprinted in 1 NLRB Legislative History of the Labor-Management Reporting and Disclosure Act of 1959* ("Leg. Hist.") 412.  Second, it recognized that disclosure plays a key role in aiding labor organization governance, as it arms members with the knowledge necessary to "vote out of office any individual whose personal financial interests conflict with his duties to members," and bring legal action against "officers who violate their duty of loyalty to the members."  *Id.*  Finally, disclosure creates a record providing a "sound factual basis" if further legislation is needed.  *Id.*

The Committee Report's description of the scope and rationale underpinning the reporting requirements further underscore their prophylactic nature:

> The committee bill attacks the problem [of conflicts of interest] by requiring union officers and employees to file reports with the Secretary of Labor disclosing to union members and the general public *any* investments or transactions in which their personal financial interests *may conflict* with their duties to the members.  The bill requires only the disclosure of conflicts of interest as defined therein.  The other

4

investments of union officials and their sources of income are not matters of public concern. No union officer or employee is obliged to file a report unless he holds a questionable interest in or has engaged in a questionable transaction. The bill is drawn broadly enough, however, to require disclosure of *any* personal gain which an officer or employee *may be* securing at the expense of the union members.

*Id.* at 14-15, *reprinted in* 1 Leg. Hist. 410-411 (emphasis added); *see also* H.R. Rep. No. 741, at 11 (1959), *reprinted in* 1 Leg. Hist. 769.

The reporting requirements are thus critical to achieving Congress' goal of promoting ethical conduct through institution of sweeping measures. One commentator of the time observed that "[o]f all the principal provisions of the new law, those incorporated in Title II, dealing with reports by unions, their officers and employees, and by employers and their agents, have perhaps the widest acceptance. They reflect the popular belief that a law that requires detailed public disclosure, under pain of serious punishment, is a strong deterrent to illegal behavior." Benjamin Aaron, *The Labor-Management Reporting and Disclosure Act of 1959*, 73 Harv. L. Rev. 851, 877 (1960).

**B.    *Labor Organization and Employee Report, Form LM-30.***

Pursuant to the rulemaking authority granted in § 438, the Secretary, on December 27, 1963, promulgated a regulation implementing § 202 of the LMRDA. *See* 28 Fed. Reg. 14384 (Dec. 27, 1963). In the forty years since, the Form LM-30 has undergone only slight modifications. *Compare* Form LM-30 & Instructions (1963) (Ex. 1) *with* Form LM-30 & Instructions (2003), *available at* http://www.dol.gov/esa/regs/compliance/olms/GPEA_Forms/lm-30p.pdf and http://www.dol.gov/esa/regs/compliance/olms/GPEA_Forms/lm-30_Instructions.pdf. Thus, the basic reporting regime established in 1963 has remained largely the same until promulgation of the revised Form LM-30 reporting requirements at issue here.

The prior Form LM-30 consisted of four sections: a section for identifying the filer, and Parts A through C. *See* Form LM-30 (2003). Part A was designed to capture transactions that would be reportable under LMRDA §§ 202(a)(1), (2), and (5). Generally, it required reporting of holdings in, transactions and arrangements with, and income or other economic benefit of monetary value received from the employer whose employees the filer's labor organization represents or seeks to

represent. It excepted from reporting (i) holdings of, transactions in, or income from, bona fide investments in securities traded on a national exchange; (ii) holdings of, transactions in, or income from, securities not listed or registered on an exchange as described in (i) so long as the amount involved was less than certain listed values; (iii) transactions involving purchases and sales of goods and services in the regular course of business at prices generally available to any employee of the employer, but not including transactions involving securities or loans; and (iv) payments and benefits received as a bona fide employee for past or present services, including payments for periods in which such employee is engaged in activities other than productive work, if such payments are required by law or a bona fide collective bargaining agreement ("CBA"), made pursuant to a custom or practice under a bona fide CBA, or made pursuant to a policy, custom, or practice adopted by the employer for employment in the establishment without regard to any holding by such employee of a position with a labor organization.

Part B of the prior Form LM-30 was intended to implement §§ 202(a)(3) and (a)(4), and required reporting of holdings in, transactions with, and income or any other economic benefit of monetary value received from, a business that deals either with the filer's labor organization, a trust in which the filer's labor organization is interested, or the employer whose employees the filer's labor organization represents or actively seeks to represent. Part B incorporated exclusions (i) and (ii) from Part A. Since 2003, in explaining that each transaction with a particular business had to be reported in a separate Part B of the form, the Form LM-30's General Instructions provided the following example: "[I]f you received income and a loan from a business which has a lease agreement with your labor organization, then you must submit two Part Bs (one part B for each transaction) with this report."

Finally, Part C of the prior Form LM-30 was designed to capture transactions reportable under § 202(a)(6), and mandated reporting of "any payment of money or other thing of value" from "any employer" other than one covered under Parts A and B, except (i) payments of the kind referred to in section 302(c) of the LMRA; (ii) "[b]ona fide loans . . . from national or state banks, credit

unions, savings or loan associations . . . or other bona fide credit institutions; and (iii) interest or dividends on securities, provided such interest or dividends have been acquired "under circumstances and terms unrelated to the recipient's status in a labor organization and the issuer of such securities is not an enterprise in competition with the employer whose employees your labor organization represents or actively seeks to represent." Exception (i) of Part C was statutorily-prescribed, while exceptions (ii) and (iii) were regulatory.

The form also made clear that the Secretary may require officers and employees to submit "special reports" on relevant information, including but not limited to matters falling within exclusions (ii) and (iv) of Part A, and exclusions (ii) and (iii) of Part C. The Secretary implemented this provision to permit gathering information about matters which were covered by the Act but went unreported as a result of the administrative exceptions.

## II.     The Revised Form LM-30.

### A.     *Basis And Purpose of the Final Rule.*

On August 29, 2005, the Secretary issued a Notice of Proposed Rulemaking ("NPRM") to solicit comments on her proposals to revise the Form LM-30 and its instructions. *See* 70 Fed. Reg. 51166. The Secretary explained that the proposed changes were part of a larger effort by the Department to improve voluntary compliance with, and enforcement of, the LMRDA. *Id.* at 51167. Revisions were necessary because reports submitted under the prior regulatory scheme were not fulfilling the statutory goal of providing union members with an accurate picture of the potential conflicts faced by their organization's officers and employees. The reforms to the Form LM-30 were crafted to "achieve more detailed and transparent reporting of the financial information that Congress, in enacting the LMRDA, intended to be made public for the benefit of union members and the public," so as to effectuate the Act's declared purpose that labor organization officials and employees "'adhere to the highest standards of responsibility and ethical conduct in administering the affairs of their organizations.'" *Id.* at 51167 (quoting 29 U.S.C. § 401(a)).

The NPRM described the sea change in the scope and complexity of union operations and

financial activities that occurred over the past forty years. To a much greater extent than in the past, many labor organizations manage benefit plans for their members, maintain close business relationships with financial service providers, operate revenue-producing subsidiaries, and partake in charitable activities. The NPRM observed that the proliferation of increasingly sophisticated and intermingled relationships among unions, trusts, businesses, and employers creates a number of financial opportunities for union officers and employers that, in turn, increase the likelihood that they have interests that potentially conflict with their duties to their union. *Id.* at 51170. Despite such systemic changes in the nature of union financial activities and the concomitant rise in potential conflicts of interest between the union officer or employee and the union s/he represents, the Department noted that the form on which labor officers and employees reported financial information remained essentially unchanged and was a barrier to full and transparent reporting. *Id.* at 51172. The Department also noted in the Final Rule that improvements in information technology over the past 40 years have greatly increased the utility of reports. *See* 72 Fed. Reg. at 36152. In earlier times, reporting to the full extent permitted by § 202 might have overwhelmed the Department without providing union members with a ready means to review more than the filings of a few officials of their union. Today, the filings are available on the internet, grouped by union and official, and thus are easily accessible to union members. *Id.*

The NPRM made apparent that, prior to the Secretary's recent rulemaking, there was no well-settled understanding of the various reporting obligations for union officials, or even recognition of the need to file a Form LM-30. Historically, LM-30 filing rates were remarkably low. Prior to initiating the rulemaking, the Department estimated a LM-30 filing rate of .03%. 70 Fed. Reg. at 51171. Acknowledging an inability to precisely measure either the current filing rate of union officers or employees or the expected rate if all individuals with reportable interests were to file, the NPRM explained that the Department's limited studies and informal inquiries indicated that labor organization officials and employees were unaware of their filing obligations and were confused by the form. *Id.* at 51171-72. The Department uncovered many occasions where a union officer or

employee was engaged in a reportable transaction posing a potential or actual conflict of interest but failed to file a Form LM-30 until the Department intervened. *Id.* at 51172-73 (listing examples). Indeed, the Department unearthed instances where compliance with the Form LM-30 would have exposed criminal conduct. *Id.* at 51173. In addition, the Department's review of the 244 LM-30 forms that were actually filed between 2001 and 2004 revealed serious and substantial deficiencies and errors. Remarkably, the majority of filers did not complete the form correctly. *Id.* at 51174. Recognizing, however, that the substantial non-compliance with the Act resulted in part from its own limited compliance assistance and enforcement efforts, the Department directed additional resources to improve its performance in these areas. On April 25, 2005, the Secretary announced a special enforcement policy under which new LM-30 filers would not have to submit reports for prior years absent extraordinary circumstances, if the new filer voluntarily submitted his/her initial LM-30 by August 15, 2005. This resulted in a large upsurge of LM-30 filings above historic levels, further evidence of the prior substantial noncompliance with the Act. 72 Fed. Reg. at 36108.

The statutory exceptions to reporting, as expanded by the instructions to the Form LM-30, and the additional purely administrative exceptions therein further compounded the confusion in assessing whether a situation gave rise to a reportable conflict of interest. Close inspection of the § 202 reporting regime and Form LM-30 revealed that the latter failed to mandate disclosure of transactions and interests prescribed by the former. Not only were these administrative exceptions unsupported by the Act's text or purpose, but they operated to hide potential and actual conflicts of interests from public view to the detriment of union members. *See* 70 Fed. Reg. 51175-78.

Accordingly, the Secretary decided that by clarifying the Form LM-30 instructions though defining key terms and including examples of reportable matters, eliminating and narrowing administrative exemptions that permitted potential conflicts to remain hidden, and enhancing compliance assistance, "union members will obtain a more accurate picture of the personal financial interests of their union's officers and employees, as those interests may bear upon their actions on behalf of the union and its members." *Id.* at 51166, 51170. The purpose of the LMRDA is to expose

potential conflicts of interest, and increasing disclosure will enable union members "to better understand any financial incentives or disincentives faced by their union's officers and employees, and to make informed choices about the leadership of their union and its management of the union." Of course, these improvements will facilitate the discovery of, and deter, fraud and self-dealing.  *Id.* at 51170.[3]

## B.    *Requirements of the Final Rule.*

On July 2, 2007, the Secretary issued the new Rule imposing a number of significant changes in the reporting requirements for labor union officials and employees.  *See* 72 Fed. Reg. 36106 (July 2, 2007).  Plaintiff's Complaint challenges five aspects of these revisions, described immediately below.

First, the Secretary revised the definition of "labor organization employee" to include an individual who is paid by an employer to perform union work, and who is acting under the control and direction of the union while performing that work.  This definition encompasses "shop stewards," who perform representational activities for union members.  *Id.* at 36109, 36124-28. Relatedly, the new Rule obligates the reporting of payments that are made by employers to shop stewards and other labor organization employees for the work done on the union's behalf.  These revisions effectively revoked administrative exemption (iv) of the former Form LM-30 Part A.  In deciding that the Act and its underlying purpose favored a change in course, the Secretary explained that these so-called "union-leave" and "no-docking" payments[4] are not received in exchange for

---

[3]The initial sixty-day comment period provided in the NPRM was subsequently extended to January 26, 2006.  *See* 70 Fed. Reg. 61400 (Oct. 24, 2005).  Of the approximately one thousand comments received, fifty were unique.  Comments were submitted by a wide range of individuals and groups representing varied interests, including unions, union members, business and trade organizations, benefit fund administrators, and an academician.  *See generally* A.R. Comments 1-1014; 72 Fed. Reg. at 36108 (summarizing comments).

[4]Under a "union-leave" agreement, an employee is permitted a leave of absence to work full-time for the union while the employer continues his/her pay and benefits.  *See* 72 Fed. Reg. at 36124.  Pursuant to a "no-docking" policy, the employer permits individuals to devote portions

performing "productive work" in the employer's trade, but rather are received exclusively for union work done on behalf and at the direction of the union. *Id.* As such, they do not fall within the "bona fide employee" exception established in § 202(a)(1) and must be reported. To alleviate the burden associated with this reporting without sacrificing disclosure of possible conflicts of interest, the Secretary adopted, in effect, a "*de minimis*" exception for such payments: payments that are made for 250 or fewer hours of union work during the year need not be reported so long as the union-leave or no-docking payments are embodied in a collective bargaining agreement ("CBA"). *Id.*

The Secretary also clarified the scope of the reporting obligations imposed by § 202(a)(6). While the Secretary initially proposed to exercise her full statutory authority by requiring reporting of all payments received from all employers except those of the kind referred to in section 302(c) of the LMRA, the comments she received prompted her to modify this position. 72 Fed. Reg. at 36108-09, 36128-30, 36139-41; 70 Fed. Reg. at 51177. The Form LM-30 now mandates disclosure of payments from employers – including trusts in which the labor union is interested, non-profit organizations, and other labor organizations – occurring under specifically delineated situations that pose actual or potential conflicts of interest between the labor organization official's or employee's own financial interests and his/her duty to the union s/he represents, but that would not otherwise be captured by the other five subsections of § 202(a). 72 Fed. Reg. at 36108-9, 36128-30, 36139-41. In addition, while retaining in large part the Part C administrative exclusion to § 202(a)(6) for "bona fide" loans received from certain types of financial institutions, the Secretary crafted a narrow exception to require submission of information on all loans obtained from credit institutions that constitute a trust in which the labor official's or employee's organization is interested. *Id.* at 36118-19, 36134-40. The Secretary reminded union officers and employees that the loan reporting exception applies only to reports due under § 202(a)(6), and does not apply, *inter alia*, "where the financial institution is a business that buys, sells, leases or otherwise deals with the union, a trust in

---

of their workday to performing union business with no loss of pay. *Id.*

which the union is interested, or in substantial part with the employer of the union members." *Id.*
at 36118. These transactions must be disclosed under § 202(a)(3) or (a)(4) of the Act. *See* Form
LM-30 (2003).

It is important to note that the Department made several other significant changes to the Form
LM-30 and modified several of its proposals based on comments received that are not challenged
in Plaintiff's Complaint. The instructions to the form contain definitions and examples integral to
the filers' reporting obligations, without which the Form LM-30 reporting could fall to its historic
levels, both in terms of numbers and misreporting of required information. For example, the
Secretary clarified the definition of "labor organization," so as to continue the "top-down" reporting
requirement for national and international union officials, and to clarify that this obligation also
applies to officials of intermediate unions. Pursuant to this rule, an officer of a national or
international union must report payments derived from businesses and employers that deal with an
affiliated intermediate or local labor organization in the ways described in the Act. 72 Fed. Reg. at
36109, 36121-24. The same obligation applies to intermediate labor organization officers vis-a-vis
their affiliated lower-level labor unions. *Id.* The Secretary also narrowed or eliminated several
administrative exceptions that were available to filers under the old rule, but were not prescribed by
the Act. For example, the Secretary simplified the longstanding *de minimis* exception by increasing
the payment amounts needed to trigger a reporting obligation (now set at $250 per year and
excluding from aggregation any amounts less than $20), and provided a limited exclusion for widely
attended gatherings. *Id.* at 36108, 36114-36116. In addition, the new rule clarified that the term
"substantial part," as used in § 202(a)(3), *i.e.* to describe the amount of business that an entity must
conduct with an employer before a reporting obligation arises, means 10% of the business's receipts.
*Id.* at 36145. It clarified several other definitions as well, including, *e.g.*, "minor child," *id.*, "actively
seeking to represent," *id.* at 36130, and "dealing," *id.* at 36142-43. The Rule eliminated the "special
report" provision, which was intended to permit the Department to obtain information about matters
that went unreported as a result of falling within a purely administrative exception. The Department

noted that it had never requested a union official to provide such a report, and discussed the infeasibility of monitoring potential conflicts in that manner. *Id.* at 36120. Finally, there were several proposed changes to the Form LM-30 that were not adopted in light of the public's comments. For example, the Department elected not to require labor organizations to notify their officers and employees of their Form LM-30 reporting obligations. *Id.* at 36108, 36113-36114.

## ARGUMENT

I.    **Standard of Review**.

Two well-established principles of statutory construction apply here and control the outcome of Plaintiff's statutory claims. First, in interpreting a statute in any context, the plain meaning of the words used by Congress controls. "[T]he task of resolving the dispute over the meaning of [a statute] begins where all such inquiries must begin: with the language of the statute itself." *United States v. Ron Pair Enter., Inc.*, 489 U.S. 235, 241 (1989). Where that meaning is clear, "it is also where the inquiry should end." *Id.* In such a case, the plain meaning is "conclusive, except in the 'rare case [in which] the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters.'" *Id.* at 242.

Second, where, as here, a court is asked to review an agency's legislative rule based on a statute committed to the agency's administration, a reviewing court must follow the familiar two-part test of *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984). Where the intent of Congress is clear, using the "traditional tools of statutory construction," *id.* at 843 n.10, "that is the end of the matter," *id.* at 842. Where the intent of Congress is not easily discerned, the *sole* issue for a reviewing court is whether the rule "is based on a permissible construction of the statute." *Id.* at 843 (footnote omitted) (emphasis added). Significantly, the Court must defer to the agency's reading unless the statutory language "unambiguously forbids" it or the interpretation "exceeds the bounds of the permissible" for some other reason. *Barnhart v. Walton*, 535 U.S. 212, 218 (2002); *AFL-CIO v. Chao*, 409 F.3d 377, 381 (D.D.C. 2005). Such legislative rules are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. *Chevron*, 467 U.S. at 844.

Importantly, an Agency's interpretation of a statute is entitled to no less deference merely because it has changed over time. *Nat'l Home Equity Mortgage Ass'n v. Office of Thrift Supervision*, 373 F.3d 1355, 1360 (D.C. Cir. 2004).

## II.    The Reforms Adopted In The LM-30 Final Rule Are A Reasonable Exercise Of The Secretary's Authority Under The LMRDA.

### A.    The Secretary's Conclusions That Union Stewards Are Union Employees Subject To Reporting Requirements, And Are Required To Disclose Employer-funded "Union-Leave" And "No-Docking" Payments, Represent Reasonable Interpretations Of Ambiguous Statutory Language And Are Critical To Achieving Congress' Objectives.

Union stewards play a powerful role in the labor organization.  Generally, a "shop steward" is responsible for informing workers of their rights under the CBA and applicable law, investigating grievances reported by union members, representing union members in presenting valid grievances to management, and safeguarding and monitoring the CBA.  In addition to serving as a primary source of information for union members, the steward acts as a conduit of information from members to the union's leadership, which is particularly useful to union negotiators when gauging rank-and-file preferences and demands during contract negotiations.  *See generally* Terry Leap, *Collective Bargaining and Labor Relations* 203, 216, 300 (1995); Herman Erickson, *The Steward's Role in the Union* 20-30 (1971); *see also* 29 U.S.C. § 402(q) (defining "shop steward").  In light of the vital functions union stewards perform on behalf of the union and its members, it is not surprising that Congress recognized that they hold positions of trust in relation to the union and its members.  29 U.S.C. § 501.  By imposing on stewards the obligations of a fiduciary, Congress recognized that stewards could use their position for personal gain and held them accountable for their financial dealings to protect the union and its members.

Viewed in this context, the Secretary's interpretation of the ambiguous term "employee" of a labor organization to encompass union stewards, who are consequently subject to Form LM-30 reporting requirements, is an important and necessary step in advancing the LMRDA's goals of deterring improper behavior and fostering informed union self-governance.  *See, e.g.*, *Mourning v.*

14

*Family Publ'ns Serv.*, 411 U.S. 356, 373-74 (1973). Likewise, the Secretary's construction of the undefined term "bona fide employee" to mandate disclosure of employer-funded "union-leave" and "no-docking" payments received by union stewards serves to alert union members of actual and potential conflicts of interests faced by union stewards responsible for advocating on their behalf. *See, e.g.*, *id*. As permissible interpretations of vague statutory terms made pursuant to an express delegation of rulemaking authority, these interpretations are entitled to *Chevron* deference.

> **1.** ***The Secretary's Decision That "Employees" Of A Labor Organization Include Individuals Performing Work On Behalf Of, And Under The Control Of, The Labor Organization Notwithstanding That Payment For Such Work Is Made By The Employer Is A Permissible Interpretation Of LMRDA § 202 And Entitled To Deference.***

Section 202 of the LMRDA requires every "employee of a labor organization" to file an LM-30 report if the employee engaged in a reportable transaction during his/her preceding fiscal year. § 202(a). Drawing from the Act's expansive definitions of "employee" and "employer," the final rule defines "labor organization employee" to mean "any individual . . . employed by a labor organization within the meaning of any law of the United States relating to employment of employees." *See* 72 Fed. Reg. at 36144. To determine whether an individual is "employed" by a labor organization such that s/he is its "employee," the Rule adopted a control-based test – a test adopted by precedent and legal dictionaries. Pursuant to this test, an individual paid by an employer to perform union work pursuant to a "union-leave" or "no-docking" policy is an employee of the labor organization because that individual "performs services for, and under the control of" the union during those times. *Id.* Because the Secretary's interpretation is easily sustainable under the statutory text, better promotes Congressional purpose than the alternative construction offered by Plaintiff, and is the product of notice-and-comment rulemaking pursuant to an exercise of delegated rulemaking authority, her construction is entitled to *Chevron* deference.[5]

---

[5]Plaintiff speculates that the Secretary's construction will "sweep tens of thousands of rank and file union members within the Form LM-30 universe." Pl.'s Br. at 15-16. In fact, the Secretary estimated that approximately 7,000 individuals would be affected by *all* the revisions

The Secretary has ample statutory authority to define the circumstances under which an individual is considered an employee of a labor organization. The LMRDA defines employee expansively to mean an "individual employed by an employer." 29 U.S.C. § 402(f). "Employer" is likewise defined broadly to include, in pertinent part, "an employer within the meaning of any law of the United States relating to the employment of any employees" with respect to employees engaged in an industry affecting commerce. § 402(e). Significantly, the statute does not impose any particular test or definition for determining whether an individual is considered to be "employed by an employer."

As the Act's definitions make clear Congress' intent to give these terms broad sweep, the Secretary is unquestionably vested with authority to adopt a rational and practical control-based test for determining whether an individual is an "employee" of a labor organization – as opposed to test where the source of payment is the dispositive factor. Given that the element of "control" is regarded as the linchpin of an employer-employee relationship in the common law as well as in legal dictionaries, the reasonableness of the Secretary's construction is obvious. In *Nationwide Mutual Insurance Co. v. Darden*, 503 U.S. 318 (1992), for example, *see* 72 Fed. Reg. at 36126, the Supreme Court sought to determine the scope of the term "employee," as defined in ERISA. Notably, ERISA uses the same circular definition of employee as that used in the LMRDA, *i.e.* "any individual employed by an employer." *Id.* at 321. Because Congress did not ascribe any specific definition to the term, the Court employed its longstanding practice of incorporating common law principles of agency to define it, noting that doing so would neither thwart the Congressional design or lead to absurd results. Thus, the Court counseled that "[i]n determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to *control*

---

to the Form LM-30, not merely those pertaining to shop stewards. 72 Fed. Reg. at 36153. It is axiomatic that the estimation provided in the administrative record, as opposed to Plaintiff's unsupported assertion, controls adjudication of this record review case. *See Fla. Power & Light Co v. Lorion*, 470 U.S. 729, 743 (1985).

16

*the manner and means by which the product is accomplished*." *Id.* at 323-24 (quoting *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-752 (1989)); *see also NLRB v. Town & Country Elec., Inc.*, 516 U.S. 85, 94 (1995). Black's Law Dictionary similarly defines "employee" as "[a] person who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to *control the details of work performance*." *Id.* (emphasis added); *see also Ballantine Law Dictionary* (defining "employee" as "one who is in such a relation to another person that the latter may control the work of the former and direct the manner in which it shall be done"). Furthermore, "employer-employee relationship" is described as "[t]he association between a person employed to perform services in the affairs of another, *who in turn has the right to control the person's physical conduct in the course of that service*." *Black's Law Dictionary* (emphasis added); *see also Spirides v. Reinhardt*, 613 F.2d 826, 831 (D.C. Cir. 1979) (instructing that "no one factor is determinative" in answering the question of whether an individual is an employee, but "the extent of the employer's right to control the 'means and manner' of the worker's performance is the most important factor to review"). Not only do these sources make apparent that the element of "control" is the critical factor in determining whether an individual is an employee of a particular employer, but they further indicate that the source of payment, while a factor to consider, is not outcome determinative. *See, e.g.*, *Darden*, 503 U.S. at 323-24. Thus, Plaintiff's claim of a "well-established rule" that "compensation by the putative employer" is a necessary prerequisite for the existence of an employer-employee relationship is clearly wrong. Pl.'s Br. at 17.

The caselaw Plaintiff cites in support of its position that an employer-employee relationship can never exist without compensation from the putative employer to the putative employee is inapposite. Both the Eighth Circuit's decision in *Graves v. Women's Professional Rodeo Ass'n*, 907 F.2d 71, 73 (8th Cir. 1990), and this Court's decision in *Dean v. American Federation of Government Employees, Local 476*, 509 F. Supp. 2d 39 (D.D.C. 2007), are confined exclusively to the Title VII context. In *Dean*, this Court was merely applying the "payroll method" test dictated

17

by the Supreme Court to assess whether "'an employer 'has' an employee on any working day'" for purposes of Title VII. *Dean*, 509 F. Supp. 2d at 52 (quoting *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 206 (1997)); *see also Graves*, 907 F.2d at 73 (applying compensation test). The Supreme Court's use of the common law control test to define "employee" in other statutes belies any notion that the payroll method test is exclusive.

Significantly, Plaintiff does not contest the Secretary's determination that union stewards operate under the direction and control of their labor union during the time they are performing union work. *See* Pl.'s Br. at 13-23. Nor could it. This point is acknowledged in caselaw adjudicating the legality of union-leave and no-docking under section 302(c)(1) of the LMRA, as well as caselaw examining the relationship between a union and its stewards for Title VII purposes. *See Reinforcing Iron Workers Local Union 426 v. Bechtel Power Corp.*, 634 F.2d 258, 261 (6th Cir. 1981) (holding that union steward does not receive payments for union activities as an employee of the employer: "It is the Union, not the employers, which exercises real control over the steward. His function is to oversee the employers' compliance with the terms of the Local Agreement"); *Dagitt v. United Food and Commercial Workers Int'l Union, Local 304A*, 345 F.3d 981, 988 (8th Cir. 2001) (observing in course of applying Title VII payroll method test that "[the union] reimburses the stewards' union dues because the stewards are performing a vital service in furtherance of the union's purpose - representing the interests of employees in enforcing the [CBA] within the workplace. Reimbursement is but a form of compensation for performing a service for the union," and also noting that under traditional agency principles, "several characteristics of the relationship between [the union] and its stewards point to a conclusion that the shop stewards are employees of the union"); *Caterpillar, Inc. v. United Auto Workers*, 107 F.3d 1052, 1055-1056 (3d Cir. 1997) (agreeing with statement in *Trailways Lines, Inc. v. Trailways, Inc. Joint Council, Amalgamated Transit Union*, 785 F.2d 101 (3d Cir. 1986) that, under the control test, individuals receiving union-leave payments from employer are not employees of the employer because they operate under control of the union, and also observing that union-leave and no-docking payments are not paid by the

18

employer as compensation for the individual's services to it).

Far from frustrating Congressional purpose, *see Darden*, 503 U.S. at 323, utilizing the common law control test for defining an employee of a labor organization directly advances the purposes underlying the LMRDA.  Application of this test will require LM-30 filings from a class of individuals – union stewards – heretofore free of any reporting obligations.[6]  As explained *supra*, union stewards play an essential role in the union, and have statutorily-imposed fiduciary duties to the union and its members.  Like the reporting provisions of the LMRDA, 29 U.S.C. § 501(a) is directed to potential and actual conflicts between a union steward's personal interest and his or her duty to the union and its members.  *See* 70 Fed. Reg. at 51167-68; 72 Fed. Reg. at 36111.  It is thus fitting to require shop stewards – who are charged with satisfying the needs of fellow union members, not the employer – to disclose any pecuniary interest that might conflict with the interests of their organization and its members.  As a policy matter, it cannot seriously be questioned that an interpretation of the Act intended to ensure that those holding fiduciary duties to union members "adhere to the highest standards of responsibility and ethical conduct in administering the affairs of their organization," 29 U.S.C. § 401(a), promotes Congress' objectives.

In light of the sweeping and ambiguous definition Congress attached to "employee," the Secretary's decision to adopt a control test is permissible and must be accorded substantial

---

[6]Plaintiff's reliance on material outside the administrative record in support of its challenge to the Form LM-30 rule – namely, a Q&A posting on the Department's website, *see* Pl.'s Br. at 16 n.7 – should not be considered by the Court.  *See* 5 U.S.C. § 706; *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) (citing *Camp v. Pitts*, 411 U.S. 138, 142 (1973)).  Plaintiff is challenging several aspects of the final LM-30 Rule, not the Department's FAQ, *see generally* Compl.; Pl.'s Br., and Plaintiff does not assert that any of the exceptions to administrative record review apply.

That being said, it is worth noting the irony of Plaintiff's criticism of the Secretary's decisions to alleviate reporting for shop stewards under circumstances where the potential for conflict of interest and abuse are minimal.  Plaintiff is not aggrieved by these "*de minimis*" exceptions, which are intended to reduce the reporting burden on union stewards.  Indeed, the Department has a longstanding practice of including such *de minimis* exceptions in the Form LM-30.  *See, e.g.*, 70 Fed. Reg. 51175; Form LM-30 (1963).

19

deference. *Chevron*, 467 U.S. at 843. As noted above, Plaintiff does not dispute the Secretary's determination that union stewards operate under the control of the union in the course of performing union duties during their workday or during a leave of absence. Consequently, her decision that union stewards constitute "employees" of the labor organization by virtue of their performance of duties on behalf of the union and under the union's control must be upheld.

    **2.**    ***The Secretary Reasonably Determined That A Union Steward Must Disclose "Union Leave" And "No-Docking" Payments Made By An Employer Because Such Payments Do Not Fall Within The Act's Reporting Exception For Payments Received As A "Bona Fide Employee" Of The Employer.***

Section 202(a)(1) of the LMRDA directs labor organization officials and employees to disclose, *inter alia*, "any income or any other benefit with monetary value" from an employer whose employees their union represents or is actively seeking to represent, "except payments and other benefits received as a bona fide employee of such employer." Recognizing the serious conflicts that may arise from a union official's or employee's acceptance of employer-funded union-leave and no-docking payments, the Secretary permissibly construed the ambiguous phrase "payments . . . received as a bona fide employee" to mean payments attributable to work "perform[ed] . . . for, and subject to the control of, the employer." 72 Fed. Reg. at 36125. The Secretary made clear that under her definition, "[c]ompensation received under a 'union-leave,' or 'no-docking' policy is not received as a bona fide employee of the employer making the payment," because those payments are not provided in exchange for work performed for, and under the control of, the employer. *Id.* Instead, she explained, such payments are received during times when the individual acts "as a representative or employee of the union." *Id.* at 36124. The Secretary's interpretation of "payments . . . received as a bona fide employee" is entitled to deference: not only is her definition a permissible construction of statutory language, but it plays a crucial part in achieving the Act's goals of deterring improper behavior by union employees and officers tasked with the important duty of representing union members against management, and providing union members with the tools necessary to make informed choices about the leadership and management of their union. Plainly, union members have

a compelling interest "in knowing whether the person who negotiates the terms and conditions of their employment is beholden to the employer." 70 Fed. Reg. at 51177.

As a threshold matter, Plaintiff does not – and cannot – convincingly argue that the LMRDA's exemption for "payments and other benefits received as a bona fide employee," is unambiguous. *See* Pl.'s Br. at 20. The Act neither defines the term "bona fide employee," nor uses it anywhere other than section 202. *See* 72 Fed. Reg. at 36126. Moreover, the legislative history of the LMRDA is silent on the intended scope of this term. *Id.*

In examining the Secretary's interpretation, it is important to follow the Supreme Court's admonition that proper construction of the LMRDA "frequently requires consideration of its wording against the background of its legislative history and in light of the general objectives Congress sought to achieve." *Wirtz*, 389 U.S. at 468. Courts should "avoid placing great emphasis upon close construction of the words," *United Steelworkers v. Sadlowski*, 457 U.S. 102, 111 (1982) (quoting *Wirtz*, 389 U.S. at 468 & n.6); instead, the LMRDA should be liberally construed to effectuate its purposes, *Smith v. United Mine Workers*, 493 F.2d 1241 (10th Cir. 1974).

Under these principles, the desirability and reasonableness of the Secretary's construction is clear. As the Secretary points out, *see* 72 Fed. Reg. at 36126, the LMRDA is prophylactic legislation designed to compel reporting of a plethora of financial transactions and arrangements, notwithstanding their propriety:

> The committee bill attacks the problem [of conflicts of interest] by requiring union officers and employees to file reports with the Secretary of Labor disclosing to union members and the general public *any* investments or transactions in which their personal financial interests *may conflict* with their duties to the members. . . . The bill is drawn broadly enough, however, to require disclosure of *any* personal gain which an officer or employee *may be* securing at the expense of the union members.

S. Rep. No. 187, at 15-16, *reprinted in* 1 Leg. Hist. 410-411 (emphasis added); *see also* H.R. Rep. No. 741, at 11, *reprinted in* 1 Leg. Hist. 769.

The union-leave and no-docking payments at issue here fall squarely within this description; indeed, they are precisely the type of payments that should be disclosed under the Act. Courts, legal

commentators, and the Secretary have realized the dangers that arise from a union employee's receipt of these payments. As observed by Judge Mansmann in her dissent in *Caterpillar*, 107 F.3d at 1060, in which the majority, as discussed *infra*, found union-leave payments legal under section 302(c)(1) of the LMRA,

> Congress was not concerned about secret, back-room deals. Congress was concerned about any form of payment that could upset the balance between labor and management. The [union-leave] payments at issue in this case do exactly that. They create a conflict of interest for union negotiators who may agree to reduced benefits for the employees in exchange for financial support for the union.

*Id.*; *see* 72 Fed. Reg. at 36125 (quoting *Caterpillar* dissent).

The analysis of one legal commentator, while recognizing that union-leave and no-docking policies serve beneficial purposes, further elaborated on the potential for abuse arising from these arrangements:

> While a breach of the union officer's fiduciary duty is most obvious when he is bribed by an employer, other more innocuous employer payments may lead the officer to breach his duty. . . . [P]ayments [from an employer] may act to divide the loyalty of the recipient and create an incentive to pursue selfish ends at a loss to the union. Numerous problems arise when a union officer's loyalties become divided between the employer who pays his wages and the union members whom he has been selected to represent. One of the dangers of allowing union representatives to accept employer payments indiscriminately is that union representative may become less loyal to bargaining unit employees. This problem may manifest itself in less effective handling of grievances, greater role conflicts, and weakened opposition to the employer in contract and grievance negotiations. Unions and union employees deserve loyal representatives of their interests.

Christopher J. Garofalo, *Section 302 of the LMRA: Make Way For the Employer Paid Union Representative*, 75 N.Y.U. L. Rev. 775 (2000); *see also* 72 Fed. Reg. at 36126-27 (discussing conflicts of interest). Indeed, one commenter on the Secretary's rule expressed support for the proposed reform based on similar concerns. *See* 72 Fed. Reg. at 36125. Another supporter revealed that his union members did not know that one of their officers received payments from the employer for union-related work. *Id.* at 36125, 36127. The Secretary concluded that while many union members may be aware of the existence of these payments if included in a CBA, they are nonetheless uninformed about the magnitude of the payments. *Id.* at 36127.

It is evident from these authorities that union members have a compelling interest in being apprised of the existence and terms of union-leave and no-docking payments that were negotiated by union representatives on their behalf. *See id.* The most obvious and natural mechanism for union members to obtain this information is the LM-30. That a CBA may include the existence of union-leave and no-docking payments does not prevent the conflict of interest inherent in these payments, or eliminate the opportunity for these payments to degenerate into corrupting bribes. Union members may not be aware of all of the provisions of the CBA, especially if they rely on their union steward to provide a summary of its terms. Even more likely, union members will not have knowledge of the trade-offs and sacrifices that they made in exchange for those terms. *See id.* Quite simply, disclosure of union-leave and no-docking payments by union officers and employees is essential for union members to adequately monitor the performance of their representatives, and their adherence to the fiduciary duties imposed by 29 U.S.C. § 501.

Nothing in the statutory language or history demands that the exception "payments . . . received as a bona fide employee" cover union-leave and no-docking payments – payments which are received *not* in exchange for work done in the employer's trade, but rather for work done at the behest of, and under the control and direction of, the union. Nor does the Act require that a "bona fide employee" of an employer be regarded as such under all circumstances. As the Secretary explained in the final rule, the proper focus "is whether . . . the official is a bona fide employee of the . . . employer *during the time for which payment is made.*" 72 Fed. Reg. at 36124. Even were the Secretary's construction of the statutory text not the "most natural," it is not "unambiguously forbidden," and when viewed in conjunction with the Act's goals, is preferable to the reading Plaintiff would give to the phrase. *See Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 702 (1991). Following the Supreme Court's guidance to consider the wording of the LMRDA in light of Congress' general objectives leads logically to the conclusion that deference to the Secretary's construction of "bona fide employee" is warranted.

Plaintiff's arguments for permitting union-leave and no-docking payments to go unreported

are easily dismissed. Plaintiff's comparison of time spent doing union work with sick leave or jury duty flounders for several reasons. Whereas compensation for sick leave, jury duty, and vacation time is available to all employees at amounts dependent on salary, the law, and perhaps time in service, union-leave and no-docking payments are available only to select employees – those elected or appointed as union stewards – on terms negotiated with the employer which may or may not be expressed in a CBA. In addition, compensation for sick leave and vacation time are benefits undoubtedly granted in exchange for work performed for the employer. In contrast, payments for union work are received in exchange for work done for another employer – the union. Moreover, during union-leave time, union employees are advocating positions adverse to the employer's interest. This fundamental distinction defeats Plaintiff's assertion that, under the Secretary's construction, sick leave and jury duty would have to be reported.

Plaintiff's reliance on cases upholding the *legality* of union-leave and no-docking payments is similarly unavailing. Courts in those cases were interpreting LMRA § 302(c)(1), which allows employer payments "to any . . . employee of a labor organization, who is also an employee or former employee of such employer, as compensation for, or by reason of, his service as an employee of such employer." That some courts have found an employer's payment to an employee for his union work to be "by reason of" his service to the employer does not somehow translate into a conclusive finding that union-leave and no-docking payments are received as a "bona fide employee" of the employer.[7] In any event, one court has rejected the "by reason of" analysis in its entirety, *Bechtel Power Corp.*, 634 F.2d 258, while another, upholding the legality of union-leave payments, held that the union workers who received them were not "current employees . . . being compensated for their current

---

[7]It is worth noting that when Senator Ball introduced section 302 of the LMRA to the legislature in 1947, he expressed concern that even negotiated payments from employers to union officials and employees might "degenerate into bribes." 93 Cong. Rec. 4805 (1987). Congress also found, consistent with the AFL-CIO's Ethical Practices Code, that no responsible union official should possess a personal financial interests that conflicts with his/her role as an employee representative. S. Rep. No. 187 (1959).

services," *Caterpillar, Inc.*, 107 F.3d at 1055-1056.  Even setting aside the vast textual differences between § 202(a)(1) of the LMRDA and § 302(c)(1) of the LMRA, Plaintiff's analysis wholly ignores that the LMRDA's reporting provisions are intended to force disclosure of a wide range of financial transactions posing potential conflict of interest concerns, notwithstanding their legality, for the purposes of enlightening union members, deterring fraud and self-dealing, and fostering union autonomy.  As noted in the House Report, "[i]n some instances matters to be reported are not illegal and may not be improper but may serve to disclose conflicts of interest. Even in such instances, disclosure will enable the persons whose rights are affected, the public, and the Government, to determine whether the arrangements or activities are justifiable, ethical, and legal."  72 Fed. Reg. at 36112 (quoting H.R. Rep. No. 741, at 4, *reprinted in* 1 Leg. Hist. 762); *see also id.* (citing S. Rep. No. 197, *reprinted in* 1 Leg. Hist. 434).

The Secretary's decision that "no-docking" and "union leave" payments are not payments received as a "bona fide employee" of the employer passes muster under the highly deferential standard of review applicable here.  In short, a construction of the text which causes reporting of previously hidden potential conflicts of interest by union members' fiduciaries is plainly necessary to further the goals of the LMRDA.

As the discussion in Part II.A. makes apparent, the Form LM-30 Rule extends the cleansing effect of disclosure to transactions not previously reached by prior interpretations of the LMRDA's reporting requirements.  These reforms reach key individuals – those charged with fiduciary duties to the union and its members – as well as arrangements that, by definition, pose serious conflict concerns.  In contrast, Plaintiff's proposed construction causes important categories of potential conflicts to remain hidden.

For all these reasons, the recognition of union stewards as employees of the labor organization, as well as the requirement that they report "no-docking," and "union-leave" payments are well within the Secretary's authority and that their reporting will advance the LMRDA's objective of "ensuring that union members are sufficiently well informed to participate in union

affairs."  29 U.S.C. § 401(c).

**B.      Section 202(a)(6) of the LMRDA Authorized The Secretary To Establish A Rule Requiring Reporting Of Payments From "Any" Employer, Including Charities, Other Labor Organizations, And Union-Trusts In Situations Giving Rise To Potential Conflicts Of Interest.**

LMRDA § 202(a)(6) is the broadest provision of § 202.  It commands reporting of "*any* payment of money or other thing of value . . . which [the labor organization official or employee] or his spouse or minor child received directly or indirectly from *any* employer or any person who acts as a labor relations consultant to an employer, except payments of the type referred to in section 302(c) of the [LMRA]."  29 U.S.C. § 432(a)(6).  Although the Secretary proposed to exercise the full power vested by this provision through requiring reporting of all payments by any employer regardless of the existence or nature of a relationship between the employer and the filer's union, *see* 70 Fed. Reg. at 51192-93, she substantially narrowed her proposal in response to the comments received, *see* 72 Fed. Reg. at 36128-30.  Reporting is thus required only of payments which, by virtue of the employer's relationship with the filer's union and/or an employer whose employees the union represents or would seek to represent, have the evident potential to pose a conflict between the union official's/employee's own financial interests and his/her duties to his union and its members.  *See id.*  Accordingly, the Final Rule provides, in pertinent part, that a report must be filed to disclose any payment of money or other thing of value from (1) "an employer that is a trust in which the filer's labor organization is interested as defined in section 3(l) of the LMRDA"[8]; (2) "an employer that is a non-profit organization that receives or is actively and directly soliciting (other than by mass mail, telephone bank, or mass media) money, donations, or contributions from the filer's labor organization"; and (3) "an employer that is a labor union that (a) has employees

---

[8]Section 3(l) of the LMRDA defines a "trust[] in which a labor organization is interested" as "a trust or other fund or organization (1) which was created or established by a labor organization, or one or more of the trustees or one or more members of the governing body of which is selected or appointed by a labor organization, and (2) a primary purpose of which is to provide benefits for the members of such labor organization or their beneficiaries."  29 U.S.C. § 402(l).

represented by the filer's union[;] (b) has employees in the same occupation as those represented by the filer's union; (c) claims jurisdiction over work that is also claimed by the filer's union; (d) is a party to or will be affected by any proceeding in which the filer has voting authority or other ability to influence the outcome of the proceeding; or (e) has made a payment to the filer for the purpose of influencing the outcome of an internal union election." 72 Fed. Reg. at 36128. The Secretary's decisions to define "employer" as used in this subsection consistently with the remainder of the Act, and to link reporting to delineated circumstances presenting potential conflicts of interest is unquestionably the best reading of the statutory text and structure. As noted by several commenters, a more restricted interpretation would subvert the Act's goals. *Id.*

The Secretary observed that the term "employer" is given exceptionally expansive reach in section 3(e) of the Act: Employer means "an employer within the meaning of any law of the United States relating to the employment of any employees" who is 'engaged in an industry affecting commerce." 29 U.S.C. § 402(e); *see* 72 Fed. Reg. at 36139-40.[9] As used in § 202(a)(6), "employer" is unqualified by any conditions or limitations; to the contrary, Congress affirmed its intent *not* to qualify the term by expressly stating "any" employer. *See, e.g.*, *Ali v. Fed. Bureau of Prisons*, 128 S. Ct. 831, 835, 836, 837 (2008) ("Congress could not have chosen a more all-encompassing phrase than 'any other law enforcement officer,' to express [its] intent" that it means "law enforcement officers of whatever kind"). Accordingly, other unions, non-profit organizations, and section 3(l) trusts which employ employees and engage in activities affecting commerce indisputably fall within

---

[9]Courts have affirmed the broad sweep of this definition in a variety of circumstances. *See, e.g.*, *Marshall v. Local Union 20, Int'l Bhd. of Teamsters*, 611 F.2d 645, 651-2 (6th Cir. 1979) (instructing that the term employer is not limited to the employer with whom the union has a collective bargaining agreement); *Brock v. Local 538, Int'l Bhd. of Teamsters*, 645 F. Supp. 156, 157 (W.D. Pa. 1986) (stating that the "prohibition extends to *all* employers even though there is no relationship between the contributing employer and the candidates or the union"); *Donovan v. Blasters, Drillrunners & Miners Union, Local 29*, 521 F. Supp. 595, 597 (S.D.N.Y. 1981).

this definition. *See* 72 Fed. Reg. at 36139-41.[10]  In the absence of any authority requiring the Court to find that Congress intended a different definition to attach to the term "employer" as used specifically in § 202(a)(6), the Court must accept the plain language of the statute.[11]

The power to require reporting of "any" payment, § 202(a)(6), from an employer necessarily includes the power to require disclosure of a subset of payments informed by the purposes of the Act. As the Secretary explained, her construction "hews to the accepted premise that Congress did not intend that union officials would have to disclose virtually all their financial affairs, while also ensuring that members receive information about situations other than those identified in sections 202(a)(1) through 202(a)(5) that may pose potential conflicts of interest for union officials." 72 Fed. Reg. at 36129.  Plaintiff does not dispute that the situations described in the Rule as giving rise to a reporting requirement do, in fact, pose conflict of interest concerns. *See* Pl.'s Br. at 29-35; 72 Fed. Reg. at 36130 (explaining conflicts).  While Plaintiff notes that the legislative history focuses on mandating disclosure of payments received by employers seeking to prevent union organizing efforts, Congress' decision to demand reporting of "any" payment in § 202(a)(6) reflects a Congressional intent to expose other types of corruption or questionable transactions that could harm unions and their members.  Thus, the Secretary's decision to require reporting of transactions with employers in specifically defined circumstances that pose potential conflicts of interest is a reasonable exercise of her discretion and well within the bounds of a permissible construction of

---

[10]The Rule notes the irony of finding that a "labor organization" is not an "employer": "If a 'labor organization' cannot be an 'employer,' then the various prohibitions relating to employer interference in union elections would be unavailable where employees of a union are themselves represented by an autonomous staff union.  There is no evidence that Congress intended to deny LMRDA rights to these workers simply because their employer is a labor organization.  This Department's longstanding position to treat unions as employer vis-a-vis staff unions is congruent with the similar treatment accorded such relationships under the [LMRA]." 72 Fed. Reg. at 36140-41.

[11]It is apparent that Congress could have limited this term if it wanted.  For example, 29 U.S.C. § 402(e) specifically excludes the United States, States, and local governments from its purview.

Congressional intent.

Plaintiff would have this Court rewrite § 202(a)(6) to restrict reporting to payments from employers who "operate in the same market as other employers whose employees the union represents or is actively seeking to represent." Pl.'s Br. at 29.[12]  This attempt to manipulate plain statutory language must be rejected.  The logical focus of Plaintiff's argument that the Secretary exceeded her authority in characterizing non-profit organizations, other labor organizations, and section 3(l) trusts as "employers" so long as they meet the statutory definition, should be the language of § 202(a)(6) itself.[13]  Plaintiff, however, devotes the bulk of its argument to discussing legislative history supporting the undisputed proposition that Congress also intended to capture employers seeking to prevent union organizing efforts in this subsection.[14]  Although this may have been the focus of the legislative history, Congress did not restrict § 202(a)(6) to such activity when it chose the language of that provision.  Nor does Plaintiff point to anything in the legislative history suggesting that Congress did not intend the construction adopted by the Secretary, or that the Secretary's former reporting requirements represented the full scope of her authority under this subsection. *See Ala. Educ. Ass'n v. Chao*, 455 F.3d 386, 393-95 (D.C. Cir. 2006).  In short, Plaintiff has only proven a point that the Secretary does not dispute.

---

[12]Plaintiff's citation to § 248.005 of the *LMRDA Interpretive Manual* to support its construction is misleading.  This provision also provides that "[Section] 202(a)(6) is designed for those situations which pose conflict of interest problems which are not covered in the previous five sections of 202."

[13]That § 202(a)(6) demands reporting of payments from "any person who acts as a labor relations consultant to an employer," in addition to "any employer" cannot reasonably be read as a limitation on "any employer," as Plaintiff urges. *See* Pl.'s Br. at 31.  Rather, it is further evidence that Congress intended § 202(a)(6) to capture a range of payments from a variety of sources.  Similarly, that Congress excepted LMRA § 302(c)(1) payments says nothing about the reach of "any employer," but shows only that any constraints on the Secretary's discretion are expressed in the text.

[14]Indeed, that Congress ultimately eschewed much narrower language in favor of the broad language of § 202(a)(6) supports Defendant's position. *See* Pl.'s Br. at 31-33.

Plaintiff's alternative construction is patently inconsistent with the remedial purposes of the Act and the plain language of § 202(a)(6). Congress' choice to use sweeping language in § 202(a)(6) untethered to any qualifications in the text or legislative history is dispositive. *See Ali*, 128 S. Ct. at 840-41. The Secretary's construction represents a faithful interpretation of the text and better advances the purposes underlying passage of the Act. Accordingly, the Secretary's position is entitled to *Chevron* deference and must be sustained.

**C.    The Secretary Provided A Rational Explanation For Limiting § 202(a)(6)'s Administrative Exception So As To Require Reporting Of Loans From Trusts In Which Labor Organizations Hold An Interest.**

As discussed above, *supra*, Part B, the Secretary reasonably interpreted § 202(a)(6)'s requirement to report "any payment of money or other thing of value" from "any employer" to mandate revelation of payments that may impact a union official's or employee's duties to her union and its members. The former Form LM-30 contained a purely administrative exception for reporting "bona fide loans, interest, or dividends from national or state banks, credit unions, savings or loan associations, insurance companies, or other bona fide credit institutions," under this subsection. *See supra*, Part I.B.; 72 Fed. Reg. at 36118. The Secretary proposed abolishing the administrative exception because it was not supported by the statute and shielded transactions that should be reported. 70 Fed. Reg. at 51177. However, upon review of comments that cited burden and privacy concerns, and upon careful consideration of whether any subset of these transactions actually raised conflict of interest concerns warranting disclosure to union members, the Rule kept much of the exception intact, but with one qualification: filers must report loans from financial institutions "that constitute a trust in which [the union officer's or employee's] labor organization is interested." *See* 72 Fed. Reg. at 36118.

The Secretary's decision to adopt a narrowly-tailored loan reporting requirement under § 202(a)(6) is entitled to *Chevron* deference notwithstanding that it represents a departure from her past position. *See Nat'l Home Equity Mortgage Ass'n*, 373 F.3d at 1360. This is because, contrary to Plaintiff's claim, Compl. ¶ 16, the Secretary has promulgated a reasoned analysis for this change.

*Nat'l Home Equity Mortgage Ass'n*, 373 F.3d at 1360. The "arbitrary and capricious standard is extremely narrow." *United States Postal Serv. v. Gregory*, 534 U.S. 1, 6-7 (2001). This Court's review is "only to ensure that the agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action.'" *Huls Am. Inc. v. Browner*, 83 F.3d 445, 452 (D.C. Cir. 1996). That review "is to determine *neither* whether [the agency's] approach was 'ideal,' *nor* whether it was the 'most appropriate,' but only whether it was reasonable." *Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 73 (D.C. Cir. 2003) (emphasis added). In conducting its review, the court "is not empowered to substitute its judgment for that of the agency." *ExxonMobil Gas Mktg. Co. v. FERC*, 297 F.3d 1071, 1083 (D.C. Cir. 2002) (internal quotation marks and citation omitted). Rather, if the "agency's reasons and policy choices . . . conform to certain *minimal standards of rationality* . . . the rule is reasonable and must be upheld, even though the Court itself might have made different choices." *Nat'l Home Equity Mortgage Ass'n v. Office of Thrift Supervision*, 271 F. Supp. 2d 264, 269 (D.D.C. 2003) (internal quotations and citation omitted); *see also United States Air Tour Ass'n v. FAA*, 298 F.3d 997 (D.C. Cir. 2002). Indeed, a decision of "less than ideal clarity" must be upheld "'if the agency's path may reasonably be discerned.'" *Formula v. Heckler*, 779 F.2d 743, 760 (D.C. Cir. 1985) (citation omitted). In this case, the Secretary's reform of her administrative exception easily passes muster under this narrow standard of review.

In the NPRM and Final Rule, the Secretary cited an example that illustrates the value of requiring disclosure to union members of loans obtained by their leaders from credit union trusts. *See* 70 Fed. Reg. at 51177; 72 Fed. Reg. at 36118. Specifically, the Department learned that a credit union controlled by a local union made 61% of its loans to four of its loan officers, three of whom served as officers of the local union. These loans were not reported on LM-30 forms. Had they been revealed, union members would have learned that their credit union was lending money to individuals on the basis of their union status and would possess the knowledge necessary "to determine whether the officials had placed their own personal interests above the union's interest in the credit union that it ostensibly controlled." 72 Fed. Reg. at 36118.

31

Plaintiff makes much of the fact that these loans should have been reported under the prior regulatory regime, as they did not meet the Secretary's definition of "bona fide loans." Pl.'s Br. at 37.[15] Plaintiff's assertion is not self-evident. A loan that, for example, represents a disbursement to another in return for a promise to repay, when made with a genuine intent by the lender to collect and the borrower to repay, would seemingly constitute a "bona fide loan." It is not a sham and it is not a disguised gift. Nevertheless, such a loan raises the same concerns as, for example, a "bona fide" business transaction between a business owned by a union officer and the employer of the union members. In this instance, the *relationship* creates a potential conflict of interest because the financial arrangement creates opportunities for the lender or employer to offer incentives (or threaten disincentives) that personally benefit or disadvantage the union officer. A vendor may be rewarded with additional or more lucrative business contracts; a lender may increase credit limits or extend the repayment period. On the other hand, a vendor may fear a reduction or termination of the business dealing; a debtor may fear that a loan will be 'called" or that terms that are ambiguous or permit the lender discretion will be construed to the debtor's detriment. Accordingly, the Secretary permissibly determined that "bona fide" loans made between a union-affiliated financial institution and an officer or employee of the same union should be disclosed.

Even if these loans would have been reported under the prior regulatory regime because they were not "bona fide," the Secretary's example highlights the danger of leaving the determination of what is and is not a "bona fide loan" to union officials and employees, and thus demonstrates the wisdom of directing that *all* loans to union officials made by credit unions in which an official's union holds an interest be reported. This fully comports with the Act's character as prophylactic legislation. By obligating the disclosure of all loans from certain entities – credit unions – whose relationship with the filer's union provides fertile ground for potential conflicts of interests, the determination of whether a particular transaction is cause for concern is left to union members, as

---

[15]For the reasons explained *supra*, n.6, this Court should disregard extra-record material.

the Act intends – and not to the filers whose transactions are subject to scrutiny.[16]

For this reason, the fact that this reporting requirement will capture "bona fide" loans does not render the reform arbitrary.  In enacting the LMRDA, Congress expressly contemplated that wholly legitimate transactions would be reported:  "'the basic theory [underlying the Act's conflict of interest provisions] is [that all] payments made by employers to labor organizations or union officials are prima facie questionable.  Some may be justified. . . . [The bill] simply requires that they be covered by public reports so that the employees affected and the public may know what has occurred.'").  72 Fed. Reg. at 36135 (quoting *Hearings on S. 505 before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare* (1959), at 127 ("1959 Senate Hearings"); *see also id.* at 36112 ("In some instances matters to be reported are not illegal and may not be improper but may serve to disclose conflicts of interest.  Even in such instances, disclosure will enable the persons whose rights are affected, the public, and the Government, to determine whether the arrangements or activities, are justifiable, ethical, and legal." (quoting H.R. Rep. No. 741, at 4, *reprinted in* 1 Leg. Hist. 762)); *AFL-CIO v. Chao*, 409 F.3d at 389 ("Section 208 [§ 438] does not limit the Secretary to requiring reporting only in order to disclose transactions involving misuse of union members' funds because leaving the decision about disclosure to trusts illustrated in the Secretary's examples would allow unions to circumvent or evade reporting on the use of members' funds diverted to the trust.").  This makes sense because as explained fully *infra*, Part D, what renders a transaction "questionable" is not necessarily the substantive terms upon which it is initially made, but rather the relationships between the individuals and entities that are parties to the

---

[16]Plaintiff's observation that certain trusts in which unions hold an interest, such as credit unions or banks, are regulated by other government agencies to deter and detect improper activity is irrelevant.  *See* Pl.'s Br. at 38; 72 Fed. Reg. at 36137.  In any event, the Secretary's example makes obvious that such oversight is not sufficient to bring to light all conflicts and questionable transactions involving union officials and employees.  The Form LM-30 – which is specifically designed to alert union members to potential conflicts of interests possessed by their leaders – is an important and necessary tool to prevent transactions undertaken at the expense of union members, and to enable enlightened union self-governing.

agreement. The Secretary's example makes clear that the Rule's narrowly-tailored limitation on the administrative bona fide loan reporting exception is rational.

Plaintiff also contends that disclosure of the loans described in the Rule's example would have revealed nothing about the credit union's loan practices, much less its reason for granting the loans. *See* Pl.'s Br. at 37-38. This argument misses the mark, because it assumes that the additional information necessary to draw these conclusions could not have been obtained elsewhere. While the failure to require the filing of a Form LM-30 in these circumstances would prevent union members and the public from ever knowing that these loans were made to their officers, much less whether they exerted an impact on their officials' responsibilities towards union members, the reverse is not necessarily true. Had union members been alerted to the existence of these loans, they would have had the option to further investigate and obtain additional information about their credit union's portfolio, practices, and finances. At that point, union members would be positioned to make an informed decision about whether certain action was warranted.

The LMRDA's structure further underscores the reasonableness of the Secretary's revision. Unlike § 202(a)(6), which exempts from disclosure only payments of the type referred to in section 302(c) of the LMRA, § 203(a) – which prescribes reporting requirements for employers – specifically excepts financial institutions from reporting "payments or loans made by any national or State bank, credit union, insurance company, savings and loan association or other credit institution." If Congress had intended to except bona fide loan reporting from the scriptures of § 202(a)(6), it could have expressly done so. *See* 72 Fed. Reg. at 36136; 70 Fed. Reg. at 51177.

Furthermore, the legislative history is replete with examples of labor organization officials engaging in unlawful activities involving loans and the complicity of financial institutions. For example, the McClellan Report disclosed irregularities regarding loans to and from labor organization officials or their associates in situations where a financial institution wished to curry favor with an official to become or remain a repository of the union's funds. *See generally* Interim Report at 224-26, 251, 445; *cf. Hearings before the Senate Subcommittee on Labor on Union*

34

*Financial and Administrative Practices and Procedures*, 85th Cong., 2d Sess. (1958), at 365-368 ("Clearly, when a man is on both sides of a loan situation, there is a conflict of interest, and he is under temptation to put his own private fortune ahead of the welfare of the members whose duty it is upon him to represent."). Relying on the experience of the Teamsters union, as revealed by the McClellan Committee's investigation, then Senator John F. Kennedy explained that under the Act, "[A union official] would be required to disclose, *inter alia*, "'his private arrangements with employers.'" 72 Fed. Reg. at 36112 (quoting 105 Cong. Rec. S817 (daily ed. Jan. 20, 1959), *reprinted in* 2 Leg. Hist. 969). Based on its discovery that union officials, employers, and others made and received loans in circumstances posing actual and potential conflicts between the personal financial interests of the parties and their duties to their organizations, Congress imposed restrictions and obligations regarding loan activities in several provisions of the LMRDA. *See, e.g.*, 29 U.S.C. § 431(b)(4) (requiring labor organizations to disclose any loans to, *inter alia*, officers or employees that aggregated to more than $250 in any fiscal year and to report for each loan a statement of its purpose, security, if any, and arrangements for repayment); § 431(b)(5) (requiring labor organizations to disclose any loans to any business enterprise and to report for each a statement of its purpose, security, if any, and arrangements for repayment); § 503(a) (prohibiting any labor organization to make directly or indirectly any loans to any officer or employee of such organization in excess of $2000); §§ 433(a)(1), 186(b). As these provisions make apparent, Congress was concerned that union leaders' receipt of loans under various circumstances would or could impact their performance of duties owed to union members.

As noted by this Court, "it is difficult to argue against the proposition – which is the thrust and congressional purpose behind the statute – that if detailed financial reports will keep leaders honest and help those they lead to choose their leaders, the more the merrier." *Ala. Educ. Ass'n v. Chao*, No. 03-253, slip op. at 10 (D.D.C. Mar. 27, 2008). Plaintiff apparently disagrees. But a mere difference of opinion is insufficient to set aside an agency rule as arbitrary and capricious. *See Formula*, 779 F.2d at 760. The Secretary appropriately determined that elimination of the

administrative bona fide loan reporting exception for loans obtained from credit union trusts would promote fiscal integrity and transparency and allow union members to determine for themselves whether such transactions require further scrutiny.  Because this explanation far surpasses "minimal standards of rationality," Plaintiff's arbitrary and capricious challenge must fail.

**D.     The Secretary Has Authority To Mandate Loan Reporting Under § 202(a)(3) And (a)(4) Of The LMRDA, And The Requirement That Union Officers And Employees Do So On The Form LM-30 Does Not Violate The APA's Notice-And-Comment Requirement.**

### 1.     *LMRDA Sections 202(a)(3) And (a)(4) Are Easily Read To Mandate Reporting Of Loans.*

The Secretary's Final Rule recognized that the administrative "bona fide" loan reporting exception modified by the Final Rule applies only to § 202(a)(6), and not to loan reporting obligations under subsections (a)(3) and (a)(4).  *See* 72 Fed. Reg. at 36118.  As discussed immediately below, this requirement is established by § 202(a)(3) and (a)(4).  Furthermore, Plaintiff's representation that the revised Form LM-30 for the first time imposed a "bona fide loan" reporting obligation pursuant to (a)(3) and (4) is incorrect.[17]  While the Department never made clear the obligation of a union official to report loans received from a business pursuant to § 202(a)(3) and (a)(4) until 2003, Plaintiff is mistaken in asserting that the 1963 instructions to the Form LM-30 evince a position that such loans were not reportable.

Section 202(a)(3) and (a)(4) together compel disclosure from union officers and employees

---

[17]It is not clear from Plaintiff's brief whether it is challenging the Secretary's authority to require the reporting of any loans under § 202(a)(3) and (a)(4), or whether its challenge is limited to the Secretary's power to compel disclosure of "bona fide" loans under these provisions. Although Plaintiff's Complaint is directed to the latter, its brief can be read both ways, and thus Defendant addresses both contentions.  In addition, while Plaintiff's Complaint claims that the Secretary's decision to require reporting of "bona fide" loans under § 202(a)(3) and (a)(4) is arbitrary and capricious, it did not specifically move for summary judgment on that point.  For the same reasons set forth in Defendant's explanation of the reasonableness of the Secretary decision to curtail the administrative "bona fide" loan reporting exception of § 202(a)(6), and for the additional reasons set forth in this Part, the Court should grant Defendant summary judgment on that claim.

of "any stock, bond, security, or other interest, legal or equitable, . . . and any income or any other benefit with monetary value (including reimbursed expenses) . . . directly or indirectly derived from" (1) any business that deals in substantial part with the business of an employer whose employees the official's union represents or is actively seeking to represent; (2) any business that deals at all with the official's union.   The term "any other benefit with monetary value," while ambiguous, is capacious and easily encompasses loans.[18]  That Congress did not use the term "loan" as it did in § 202(a)(2) of the Act cannot bear the weight Plaintiff attaches to it.  *See* Pl.'s Br. at 25-27.  Indeed, § 202(a)(2) does not contain the more expansive phrase "benefit with monetary value," which also appears in § 202(a)(1); it may very well be that Congress intended the more expansive phrase employed in these subsections to reach a broader swath of financial conduct than merely loans. Plaintiff argues that Congress could not have intended "benefit with monetary value" to include loans, because otherwise there would be some overlap between reporting under subsections (a)(1) and (a)(2).  But Congress' specific use of the term "loan" in subsection (a)(2) – but not (a)(1) – may have been intended to ensure that all loans be disclosed in the event "bona fide" loans were considered to fall within the (a)(1) exception as a "payment[] . . . [or] other benefit[] . . . received as a bona fide employee."[19]

This exercise demonstrates the futility of engaging in the "word-by-word parsing" of the LMRDA that forms the linchpin of Plaintiff's argument.  The Supreme Court has cautioned courts

---

[18]Plaintiff's argument that a bona fide loan is not literally a "benefit with monetary value" is unfounded.  Pl.'s Br. at 26.  It is evident that loans enable individuals to afford items they otherwise could not purchase.  Indeed, Plaintiff betrays its argument when it defines a bona fide loan as an "arm's length commercial transaction in which the lender provides the loaned funds for the borrower's use and the borrower compensates the lender for the full monetary value of that use."  *Id.*  As the quote reveals, Plaintiff cannot avoid the obvious that loans carry with them intrinsic "monetary value."

[19]It addition, it is telling that the Secretary has always interpreted the similar language used in § 202(a)(6) to include loans – as evidenced by the very existence of the administrative exception for "bona fide" loans.  But unlike the administrative exception for "bona fide" loans contained in § 202(a)(6), there has never been any such exception under § 202(a)(3) or (a)(4).

against interpreting the LMRDA based on a narrow construction of the text at the expense of frustrating the underlying objectives of the statute. *See Sadlowski*, 457 U.S. at 111; *AFL-CIO v. Chao*, 298 F. Supp. 2d 104 (D.D.C. 2004).  Not only does Plaintiff's cramped interpretation run afoul of this principle, but it functions to shield from reporting an entire category of transactions which, as the legislative history makes clear, were the source of a large part of the corruption, self-dealing, and other suspect arrangements that disclosure was intended to prevent. *See supra*, Part C. The McClellan Report specifically discussed irregularities regarding loans made to labor union officials by businesses dealing with the union or its section 3(l) trust.  *See* Interim Report, 77-83, 112-25, 227-29, 445.  Thus, while the interpretation advocated by Plaintiff may be permissible, it is readily apparent that the Secretary has advanced a preferable interpretation in view of the LMRDA's objectives and legislative history.[20]  As a result, the Court must defer to the Secretary's interpretation.  *See Barnhart v. Walton*, 535 U.S. 212, 221-22 (2002); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

Next, Plaintiff enumerates the "common" types of loan transactions captured under the Secretary's interpretation of § 202(a)(3) and (a)(4), and proceeds to argue that Congress could not have intended the disclosure of these "private" matters.  *See* Pl.'s Br. at 24-25.[21]  This argument proves too much.  These provisions also require the reporting of any income and purchases and sales

---

[20]In support of its construction, Plaintiff points to the LMRDA's amendments to § 302 of the LMRA.  Originally, this section made it unlawful for employers "to pay or deliver . . . any money or other thing of value to any representative of his employees."  The amendment altered this provision to make it unlawful for employers "to pay, lend, or deliver . . . any money or other thing of value."  *See* Pl.'s Br. at 26 n.12.  The more plausible reading of this change is that Congress intended to make clear that loans were included along with the other types of employer payments proscribed by that section, as it is not generally understood that "pay" or "deliver" would include making a loan.  Moreover, Plaintiff ignores that the most significant change imposed by the amendments was the addition of "any benefit with monetary value" after "any income" in subsections (a)(1), (a)(3), and (a)(4).  *Compare* 29 U.S.C. § 432(a) *and* S. 3974, 85th Cong. (1958), § 102(a).

[21]Again, Plaintiff's reliance on extra-record material – the Department's Form LM-30 FAQ – should be disregarded by this Court.  *See* Pl.'s Br. at 23 & n.10, 24, 25 n.11; *supra*, n.6.

of securities – which one could reasonably argue are just as private and just as pedestrian, and thus outside the intended scope of reporting.  As a policy matter, there is no reason to distinguish between loans on the one hand, and income or investments on the other, such that a "bona fide" exception is required for the former, but not for the latter.  Under Plaintiff's theory, the LMRDA would command the disclosure only of transactions or arrangements made on dubious terms, but this is plainly not the case.  As explained by Professor Cox, the feature that renders transactions "questionable" for purposes of the Act is not necessarily the terms upon which they are initially made, but rather the interrelationships between union officers and employees, employers, labor organizations, and businesses: "'the basic theory [underlying the Act's conflict of interest provisions] is [that all] payments made by employers to labor organizations or union officials are prima facie questionable. Some may be justified.'" 72 Fed. Reg. at 36135 (quoting 1959 Senate Hearings, at 127).  This explanation dovetails with Congress' instruction that the LMRDA requires

> union officers and employees to file reports with the Secretary of Labor disclosing to union members and the general public any investments or transactions in which their personal financial interests *may* conflict with their duties to the members.  The bill requires only the disclosure of conflicts of interest *as defined therein*.  The other investments of union officials and their sources of income are not matters of public concern. . . . The bill is drawn broadly enough, however, to require the disclosure of any personal gain which an officer or employee *may* be securing at the expense of union members.

S. Rep. No. 187, at 14-15, (1959), *reprinted in* 1 Leg. Hist. 410-11 (emphasis added); *see also* H.R. Rep. No. 741, at 11 (1959), *reprinted in* 1 Leg. Hist. 769.  Thus, while a labor organization official need not disclose a loan made by a national bank where it has no relationship with the union, a trust in which a union holds an interest, or employer whose employees the union represents or seeks to represent, the official must disclose such loan if any of the requisite statutory relationships are present.  It is the former types of transactions that are considered "private" financial matters beyond the reach of the LMRDA.

In addition, unless all loans – including "bona fide" loans – are reported, union members will not know they exist and will be unable to monitor compliance with repayment terms, release of

security, reduction of interest rates, etc.  Merely because a loan may initially be made on "bona fide" terms does not mean that those terms cannot or would not be altered in exchange for favors granted by a union official to an entity that does a substantial amount of business with the employer whose employees the union represents or actively seeks to represent, or deals directly with the union or its trust, that would detrimentally impact union members.

Public disclosure is the touchstone necessary to deter and eliminate conflicts of interest, and to enable enlightened union self-governance.  This necessarily requires the reporting of matters that are neither illegal nor improper.   As the Act grants the Secretary the authority to require labor officials to report of *all* loans – including bona fide loans – with businesses that meet the requisite conditions imposed § 202(a)(3) and (a)(4), the Court should grant summary judgment for Defendant on this issue.

2.    ***The Secretary's Interpretation of "Benefit With Monetary Value" As Encompassing Loans Is An Interpretive Rule Exempt From Notice And Comment Requirements.***

Plaintiff's representation that the Final Rule imposed a new requirement that loans must be reported under § 202(a)(3) and (a)(4) is incorrect.  What Plaintiff characterizes as a "new rule" is simply an interpretive announcement designed to increase compliance with the Act.  Characterized properly as interpretive, the rule is expressly exempted from the APA's notice-and-comment requirement.  5 U.S.C. § 553(b).

An interpretive rule "simply states what the administrative agency thinks the [underlying] statute means, and only reminds parties of existing duties."  *United Tech. Corp. v. EPA*, 821 F.2d 714, 718 (D.C. Cir. 1987).  This is exactly what the Secretary has done here.  In comparing the original Form LM-30 instructions, issued in 1963, which did not explicitly note that loans are reportable pursuant to § 202(a)(3) and (a)(4), with the Final Rule, Plaintiff neglects to mention the Form LM-30 in effect immediately prior to passage of the Final Rule instructed that loans from

businesses meeting the threshold conditions of § 202(a)(3) or (a)(4) be reported.[22]  Specifically, the form's general instructions counseled that:

> [I]f more than one interest, transaction, or income or other benefit is involved . . ., complete a separate Part A, B [pertaining to transactions with businesses pursuant to § 202(a)(3) or (a)(4)], or C for each such interest, transaction, or income or other benefit.  For example, if you received income *and a loan* from a business that has a lease agreement with your labor organization, then you must submit two Part Bs (one part B for each transaction) with the report.

Form LM-30, *General Instructions for Reportable Transactions and Interests, Parts A, B, and C* (2003) (emphasis added).[23]  Accordingly, the Final Rule creates no new reporting obligation. Instead, it simply reminds labor officials and employees of their obligation to report loans obtained from employers, and from businesses meeting the (a)(3) or (a)(4) threshold conditions: "This [the regulatory bona fide loan exception] applies, and has always applied, only to reports due under section 202(a)(6).  Where the financial institution is an employer whose employees the filer's union represents or is actively seeking to represent, the exception would not apply.  Nor would it apply where the financial institution is a business that . . . deals with the union, a trust in which the union is interested, or in substantial part with the employer of the union members."  72 Fed. Reg. at 36118.

By reiterating filers' obligations under § 202(a)(3) and (a)(4), the Secretary did not "intend[] to create new law, rights, or duties" completely separate and independent from the Act. *United Tech. Corp.*, 821 F.2d at 718; *see Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 93 (D.C. Cir. 1997) (explaining that a legislative rule "modifies or adds to a legal norm based on the agency's own authority . . . to engage in supplementary lawmaking").  Rather, her specific addition of "loans" to

---

[22]Plaintiff reads item 12 of the 1963 Instructions as a direction to union officials not to report loans received from businesses.  While this is one possible reading of the instructions, they may also reasonably be read to require that loans must be reported, but without the same specificity as required for loans from and arrangements with an employer whose employees the official's union represents or seeks to represent.

[23]Although this example is clear, the specific instructions appearing under Part B of the 2003 Form LM-30 are not.  Those instructions contain virtually the same ambiguous language as the 1963 version upon which the AFL-CIO relies as evidence of an intention to except union officials from reporting loans obtained from businesses.

the former Form LM-30 Instructions as an example of a reportable transaction under § 202(a)(3) and (a)(4), and her reminder in the Final Rule, merely clarified the duty already created by these provisions.

It is settled that "an agency may use an interpretive rule to transform a vague statutory duty or right into a sharply delineated duty or right." *Cent. Tex. Tel. Coop., Inc. v. FCC*, 402 F.3d 205, 214 (D.C. Cir. 2005) (internal quotation marks omitted); *see also Syncor*, 127 F.3d at 94 ("An interpretive rule, . . . typically reflects an agency's construction of a statute that has been entrusted to the agency to administer."); *General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C. Cir. 1984) (en banc) (holding that rule was interpretive because "the entire justification for the rule [was] comprised of reasoned statutory interpretation, with reference to the language, purpose and legislative history of the statute"). As a result, the Secretary can shed light on a capacious phrase such as "benefit with monetary value" by providing specific examples of and guidance on what transactions must be reported without engaging in notice-and-comment rulemaking. That the rule does not "parrot" the statutory language does not alter this analysis. *Cent. Tex. Tel. Coop., Inc.*, 402 F.3d at 214 (citing cases).

Also relevant to this analysis is the Secretary's view of her construction as interpretive. *United Tech. Corp.*, 821 F.2d at 718. Further evidencing the Secretary's intent that the 2003 form and instructions effect no substantive change, is that they were not published in the Federal Register. While not dispositive, the Secretary's view of her construction as interpretive is entitled to deference. *Id.*

In addition, not only has the Secretary demonstrated that her clarification has been publicly available as early as 2003, but Plaintiff has failed to cite to any earlier, contrary interpretation that might justify closer scrutiny of the interpretive rule in issue. Indeed, since 1963 the public was made aware that the Secretary interpreted "any payment of money or other thing of value" as used in § 202(a)(6) to include loans – as evidenced by the administrative exception for "bona fide" loans. This express notice significantly detracts from any claim that the Secretary previously interpreted "benefit

42

with monetary value" in § 202(a)(3) and (a)(4) differently.

Finally, that the Secretary's reminder and renewed compliance efforts may cause historically non-compliant labor organization officials/employees to alter "primary conduct," does not transform a statutory requirement into a new rule requiring notice and comment. *Cent. Tex. Tel. Coop., Inc.*, 402 F.3d at 214 (holding that "an interpretive rule does not have to parrot statutory or regulatory language but may have the *effect* of creating new duties" (citation omitted)); *Warshauer v. Chao*, No. 06-0103, at *41-42 (N.D. Ga. Aug. 25, 2006) ("The fact that many DLC's [Designated Legal Counsel] may not have known of [the Secretary's] position or the fact that the Secretary has not engaged in enforcement actions against DLCs who do not file Form LM-10s does not change the longstanding nature of the rule.").

Quite simply, as an interpretation of an ambiguous statutory term, the Secretary's Rule is prototypically interpretive in nature. Plaintiff's assertion of a notice-and-comment violation is thus without merit.

### 3.     *Alternatively, The Secretary's Requirement That Labor Organization Officials/Employees Report Loans Obtained From Businesses Under Sections 202(a)(3) And (a)(4) Is A Logical Outgrowth Of The Proposed Rule.*

An agency satisfies its APA notice-and-comment requirement so long as its final rule is a "logical outgrowth" of the rule original proposed. A rule is considered a logical outgrowth if interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period. *See First Am. Discount Corp. v. Commodity Futures Trading Comm'n*, 222 F.3d 1008 (D.C. Cir. 2000).

The challenged rule here is a "logical outgrowth" of the proposed rule. The proposed rule expressly sought comment on whether financial institutions that constitute section 3(l) trusts (credit union trusts) should be treated as "businesses" dealing with a labor organization, thus giving rise to reportable transactions under § 202(a)(3) or (a)(4). The rule also sought comment on whether these credit union trusts should be deemed "employers" for purposes of reporting under § 202(a)(6). 70 Fed. Reg. at 51182. Finally, the rule sought comment on the Secretary's proposal to modify the

"bona fide" loan reporting exception associated with § 202(a)(6), such that all loans obtained by labor officials and employees from credit unions would be reportable. In so proposing, the Secretary provided an example of a situation where a credit union controlled by a local union made 61% of its loans to four loan officers, three of whom were officers of the local. *See* 70 Fed. Reg. at 51177. This example makes evident that the Secretary's proposal would require that all loans from credit unions in which an official's union holds an interest be disclosed – whether that credit union is considered a "business" dealing with the union, or deemed an "employer."

Significantly, many entities submitted comments expressing the very same concerns raised by Plaintiff in this suit about the burdens and privacy implications associated with of having to report bona fide loans from financial institutions. A union opined that the public should not "be entitled to know the amount of a bona fide mortgage that a union employee receives from a financial institution whose employees the union does not represent or seeks to represent and made under terms generally offered by the financial institution to the public. Comment 959, at 23. Echoing these concerns, another commenter argued that reporting loans such as home mortgages, automobile loans, and financial aid for education would invade the privacy of union officials without serving a meaningful purpose. Comment 976. This commenter, and also the International Foundation of Employee Benefits, further urged that section 3(l) trusts not be treated as businesses for purposes of reporting under § 202(a)(3) and (a)(4). Another commenter discussed the effects of the Secretary's proposal as follows: "[t]he effect of eliminating these exemptions would be to require the overwhelming majority of union officers and employees to file an LM-30. A *loan from a bank or other credit institution is obviously a payment of money*, and virtually all such credit institutions will be employers within the meaning of the LMRDA. Thus, without the bona fide loan exemption, every union officer or employee who receives a mortgage or home equity loan, have engaged in a reportable transaction." Comment 987 at 21 (emphasis added). Union officials would be required "to report virtually all loans they receive." *Id.*

The "key focus" of the logical-outgrowth inquiry is whether the purposes of notice and

comment have been served.  *See Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1311 (D.C. Cir. 1991).  As the above examples make apparent, commenters understood that the Secretary's proposal would require the reporting of loans from financial institutions, and they input their views on the ramifications of such a requirement.  While the Secretary did not explicitly solicit comments on the wisdom of requiring such reporting from all financial institutions (as opposed to only credit union trusts) under § 202(a)(3) and (a)(4) , her Rule so mandating is plainly a "logical outgrowth" of her proposal.

**E.    If Any Of Plaintiff's Challenges Are Sustained, The Appropriate Remedy Is To Remand The Unlawful Portion Of The Rule.**

Most aspects of the multifaceted Form LM-30 Rule are untouched by Plaintiff's suit.  If this Court invalidates any aspect of the Rule at issue here, the proper remedy is to remand the affected portion of the Rule to the Secretary for further action.  *See Allied-Signal, Inc. v. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993).

## CONCLUSION

For the foregoing reasons, Defendant's Cross Motion For Summary Judgment should be granted, and Plaintiff's Motion For Summary Judgment should be denied.

DATED: April 21, 2008                 Respectfully submitted,

                                      JEFFREY BUCHOLTZ
                                      Acting Assistant Attorney General

                                      JEFFREY A. TAYLOR
                                      United States Attorney

                                      RICHARD G. LEPLEY
                                      Assistant Branch Director, Civil Division, Federal
                                      Programs Branch

                                      */s/ Tara M. La Morte*
                                      TARA M. La MORTE
                                      Trial Attorney
                                      Civil Division, Federal Programs Branch
                                      United States Department of Justice
                                      20 Massachusetts Ave., N.W., Room 7326
                                      Washington, D.C. 20530
                                      Telephone: (202) 514-1275
                                      Facsimile: (202) 616-8202
                                      Email: tara.lamorte@usdoj.gov

                                      *Attorneys for Defendant*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Case No. 1:08-cv-00069 (CKK) |
| ELAINE L. CHAO, Secretary, United States Department of Labor, | ) ) ) ) |
| Defendant. | ) ) ) |

## DEFENDANT'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rules 7(h) and 56.1, Defendant, Elaine L. Chao, in her official capacity as Secretary of the United States Department of Labor ("Secretary" or "Department"), by and through undersigned counsel, submits the following statement of material facts as to which there is no genuine issue in support of Defendant's Cross Motion For Summary Judgment.

Judicial review of this action is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* In APA cases, judicial review is, with exceptions not asserted or applicable here, confined to the administrative record compiled by the agency, and does not contemplate a new factual record developed in the district court. *See, e.g.*, *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (observing that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"). Therefore, there are no material facts in dispute and there is no role for the admission of facts or evidence into the record beyond the administrative record itself. *See Fla. Power & Light*

*Co. v. Lorion*, 470 U.S. 743-744 (1985).   In this case, Defendant filed the administrative record with this Court on February 29, 2008.

1.   In 1959, Congress enacted the Labor Management Relations and Disclosure Act, 29 U.S.C. §§ 401 - 531.  Title II of the Act, entitled "Reporting by Labor Organizations, Officers and Employees of Labor Organizations, and Employers," requires these individuals and entities to disclose details regarding their financial arrangements through annual reports filed with the Secretary of Labor ("Secretary").  29 U.S.C. §§ 431-41. Specifically, LMRDA § 202 requires labor organization officers and employees to file with the Secretary a financial report if they, or their spouse or minor child engaged in certain financial transactions or held certain interests in the preceding calendar year.  29 U.S.C. § 432.  The Secretary of Labor has authority under the act to "issue, amend, and rescind rules and regulations prescribing the form and publication of reports required to be filed under Title II of the Act," as well as promulgate other reasonable rules and regulations she finds necessary "to prevent the circumvention or evasion of such reporting requirements," 29 U.S.C. § 438.  Congress also vested the Secretary with the power to "bring a civil action for such relief (including injunctions)," "whenever it shall appear that any person has violated or is about to violate any of the provisions of [Title II]."  29 U.S.C. § 440.

2.   On December 27, 1963, pursuant to the rulemaking authority granted in 29 U.S.C. § 438, the Secretary promulgated a regulation ("Form LM-30") implementing § 202 of the LMRDA.  A.R. 1015 (citing 28 Fed. Reg. 14384 (Dec. 27, 1963)).  In 1963, the Secretary also issued the version of Form LM-30 and accompanying instructions which were

2

effective until 2003.  *See* Defendant's Response To Plaintiff's Statement Of Material

Facts As To Which There Is No Dispute, Ex. 1.  At that time, a slightly revised version

was issued.  *See id.* ¶ 6 & Response.

2.     On August 29, 2005, the Secretary caused to be published in the Federal Register a

notice of proposed rulemaking ("NPRM") entitled "Labor Organization Officer and

Employee Reports; Proposed Rules" to solicit comments on her proposals to revise the

Form LM-30 and its instructions.  70 Fed. Reg. 51166 (Aug. 29, 2005); A.R. 1015.

3.     The initial sixty day comment period provided for in the NPRM was subsequently

extended to January 26, 2006.  70 Fed. Reg. 61400 (Oct. 24, 2005); A.R. 1016.

4.     In response to the proposed rule, the Secretary received over 1,000 comments from

unions, union members, business and trade organizations, benefit fund administrators, an

academician, and other interested parties.  A.R. 1-1014.

5.     The Secretary reviewed and responded to the comments she received in response to the

proposed rule and developed the final rule.  *See* 72 Fed. Reg. 36106 (July 7, 2007); A.R.

1017.

6.     On July 7, 2007, the Secretary caused to be published the final rule, entitled "Labor

Organization Officer and Employee Report, Form LM-30."  72 Fed. Reg. 36106; A.R.

1017.  The Form LM-30 had not undergone any substantive changes from the time the

Secretary first promulgated the Form LM-30 rule in 1963 to publication of the instant

Form LM-30 rule in 2007.  *Id.*

7.     The final rule made a multitude of changes to the former rule LM-30, including but not

limited to (1) revising the definition of "labor organization employee" to mean "any

3

individual . . . employed by a labor organization within the meaning of any law of the United States relating to employment of employees," and clarifying that this included individuals who are paid by an employer to perform union work, and who are acting under the control and direction of the union while performing that work; (2) revising the definition of "bona fide employee" to mean "an individual who performs work for, and subject to the control of, the employer," and stating that compensation received under a "union-leave," or "no-docking" policy is not received as a bona fide employee of the employer making the payment; (3) determining that, pursuant to 29 U.S.C. § 432(a)(6), a report must be filed to disclose any payment of money or other thing of value from, *inter alia*, (a) "an employer that is a trust in which the filer's labor organization is interested as defined in section 3(l) of the LMRDA"; (b) "an employer that is a non-profit organization that receives or is actively and directly soliciting (other than by mass mail, telephone bank, or mass media) money, donations, or contributions from the filer's labor organization"; and (c) "an employer that is a labor union that [(i)] has employees represented by the filer's union[;] [(ii)] has employees in the same occupation as those represented by the filer's union; [(iii)] claims jurisdiction over work that is also claimed by the filer's union; [(iv)] is a party to or will be affected by any proceeding in which the filer has voting authority or other ability to influence the outcome of the proceeding; or [(v)] has made a payment to the filer for the purpose of influencing the outcome of an internal union election"; and (4) revising the administrative exception regarding the reporting of "bona fide" loans from financial institutions under 29 U.S.C. § 432(a)(6) to require labor organizations and employees to report loans from financial institutions "that

4

constitute a trust in which [the union officer's or employee's] labor organization is interested." 72 Fed. Reg. 36106; A.R. 1017.

8.     On July 13, 2007, the Secretary caused to be published a correction to the final rule. 72 Fed. Reg. 38484; A.R. 1018. The correction clarified that the effective date of the final rule was August 16, 2007, and that the beginning date for the mandatory submission of Form LM-30 reports filed under the final rule was November 16, 2008. *Id.*

9.     All further material facts in this action are contained in the certified administrative record.

DATED: April 21, 2008                    Respectfully submitted,

                                         JEFFREY BUCHOLTZ
                                         Acting Assistant Attorney General

                                         JEFFREY A. TAYLOR
                                         United States Attorney

                                         RICHARD G. LEPLEY
                                         Assistant Branch Director, Civil Division, Federal
                                         Programs Branch

                                         */s/ Tara M. La Morte*
                                         TARA M. La MORTE
                                         Trial Attorney
                                         Civil Division, Federal Programs Branch
                                         United States Department of Justice
                                         20 Massachusetts Ave., N.W., Room 7326
                                         Washington, D.C. 20530
                                         Telephone: (202) 514-1275
                                         Facsimile: (202) 616-8202
                                         Email: tara.lamorte@usdoj.gov

                                         *Attorneys for Defendant*